Argued May 2, reversed October 26, petition for rehearing denied
November 9, 1955

# BRANDTJEN & KLUGE, INC. *v.* BIGGS
## 288 P. 2d 1025

*John C. Beatty, Jr.*, argued the cause for appellant. With him on the brief were Dusenbery, Teiser, Martin & Schwab, all of Portland.

*George H. Corey* argued the cause for respondent. With him on the brief were Proebstel & Isaminger, all of Pendleton.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment of the circuit court, which was entered in favor of the defendant after the court had sustained the defendant's motion for an involuntary nonsuit and had granted a recovery against the plaintiff in the sum of $50 upon the defendant's counterclaim.

The transaction out of which the challenged judgment arose was evidenced by a written contract for the sale by the plaintiff, and the purchase by the defendant, of a printing press. The defendant-respondent is Helen M. Biggs, who was engaged in business as Biggs Printing Company. Throughout the transaction which underlies this case she was represented by one J. M. Biggs, who managed her business. The defendant (Helen M. Biggs) did not participate in the contract negotiations and did not testify. Hereafter, when we speak of Biggs, we will mean J. M. Biggs.

In view of the importance which the assignments of error attach to the pleadings, we shall take note

of them. The complaint (amended) alleges that (1) the plaintiff, Brandtjen & Kluge, Inc., is a Minnesota corporation; (2) May 23, 1950, the plaintiff and the defendant entered into the aforementioned contract whereby the defendant agreed to pay $3,090.50 for the press; (3) the contract bound the defendant to pay $50 upon execution and the "balance in full upon tender of bill of lading, subject to a two per cent (2%) discount"; (4) the contract provided that in the event the defendant "refused to accept the said bill of lading, when tendered, he agreed to reimbruse" the plaintiff for all damages; (5) "June 8, 1950, said equipment arrived at Pendleton, Oregon, by freight, and the defendant was presented with a sight draft and a bill of lading, said sight draft being in the amount of Two Thousand Nine Hundred Seventy-eight and 69/100 Dollars ($2,978.69), constituting the balance due on said contract of sale, less two per cent (2%) discount and Fifty Dollars ($50.00) down payment, but the said defendant failed and refused, unjustifiably, to honor the same"; (6) as a result of the defendant's refusal to accept and pay for the press, the plaintiff was compelled to return it to its plant in St. Paul, Minnesota, thereby incurring a transportation expense of $573.41; (7) the plaintiff was at all times ready, willing and able to perform its contract but the defendant "refused to honor the sight draft and accept delivery of the equipment upon its arrival in Pendleton".

The complaint incorporated within itself a copy of the contract. The latter indicates that the plaintiff's place of business is in St. Paul, Minnesota, and that the defendant is located in Pendleton. The contract required the plaintiff to ship the press to Pendleton.

The answer (amended) denied the paragraph of the

complaint which averred that the plaintiff was a corporation; admitted that on May 17, 1950, the parties "entered into the written contract described in plaintiff's complaint" and stated (1) "by the terms of said contract, plaintiff agreed to furnish a competent man to install said equipment"; (2) "on the 25th day of May, 1950, the plaintiff in writing required the defendant, upon arrival of the equipment to uncrate it, remove the skids if it was desired to operate the press with the skids off, place the press exactly where it was intended to be operated, remove the rust preventative, check the machine carefully and if any parts were broken, to call the transportation company for inspection of the damage and arrange to file claim for the damages and if any parts were broken, to order the same from the factory and have them in the defendant's plant before installation and if the press was not prepared for installation strictly in accordance with said instruction, it would not be installed until such preparation was completed." The answer alleged "that the defendant, immediately upon receiving such instructions, demanded that the plaintiff comply with the contract and furnish a competent man to install the press as agreed or cancel the order." According to further parts of the answer, the plaintiff refused to furnish a competent installer unless the defendant complied with the plaintiff's instructions. As a counterclaim, the answer, after averring that the defendant paid the plaintiff $50 upon signing the contract, alleged "the plaintiff has failed and refused to deliver said press and install the same according to the terms of said agreement." It demanded judgment for $50.

The reply denied the parts of the answer which affirmed that, after signing the contract, the plaintiff made additional demands upon the defendant. All

other allegations of the answer which were at variance with the complaint were denied.

The first assignment of error follows:

"The court erred in granting respondent's motion for a judgment of involuntary nonsuit."

The essential parts of the motion for a nonsuit read:

"Comes now the defendant and moves the court for an order of involuntary non-suit on the following grounds and for the following reasons:

"(1) That the plaintiff has failed to prove its case sufficient to be submitted to a jury in that the plaintiff has entirely failed to prove that a bill of lading was ever tendered to the defendant and refused by the defendant.

"(2) That the plaintiff was a corporation, existing under and by virtue of the laws of Minnesota and authorized (sic) to do and engage in and doing business in the State of Oregon.

"(4) That there is no evidence in this case sufficient to submit to a jury in support of the allegations of the plaintiff's complaint."

We will now consider the contention that the record fails to establish that the plaintiff is a corporation.

*Strang v. Oregon-Washington R. & N. Co.,* 83 Or 644, 163 P 1181, declares:

"It is settled in this state that when the corporate existence of a plaintiff corporation is put in issue, the allegation in that respect must be proved; for want of which the plaintiff must fail:  *  *  *."

See, also, *The Multorpor Co. v. Reed,* 122 Or 605, 260 P 203.

Upon the trial, the court sustained objections to evidence submitted by the plaintiff in an effort to establish its corporate character. The plaintiff does

not challenge the exclusionary rulings. We shall now take note of the only other facts in the record which may indicate that the plaintiff is a corporation.

As we said, the complaint includes a copy of the contract and the answer admitted that the parties "entered into the written contract described in plaintiff's complaint." The contract's opening paragraph recited:

"This agreement made on this 17th day of May, A. D., 1950, by and between Brandtjen & Kluge, Inc., (a Minnesota corporation) of St. Paul, Minnesota, vendor, and * * *."

The vendor's (plaintiff's) signature to the contract appeared as follows: "Brandtjen & Kluge, Inc by". At that point a representative of the plaintiff wrote his name. The counterclaim upon which the defendant recovered judgment against the plaintiff in the sum of $50 alleged that the defendant paid to the plaintiff that sum of money upon the signing of the contract, and, after averring that the plaintiff failed to deliver the press, demanded "judgment against the plaintiff" for $50.

The plaintiff maintains that (1) the defendant, in contracting with the plaintiff under the latter's name of Brandtjen & Kluge, Inc., became estopped to deny in this action, which was based upon the contract, that the plaintiff was a corporation; (2) by counterclaiming against the plaintiff in the latter's corporate name, the defendant was estopped to challenge the plaintiff's status as a corporation; and (3) a foreign corporation which does no more than solicit orders in this state, and possibly maintain or defend a suit, is not required to procure from the state a certificate of authority.

■ The defendant has advanced no argument con-

cerning the plaintiff's third contention, and we believe that we are justified in deeming it free from dispute.

We come now to the question as to whether or not the fact that the defendant contracted with the plaintiff in the latter's corporate name and filed a counterclaim against the plaintiff estops the defendant from challenging the plaintiff as a corporate entity.

In *McIntosh Livestock Co. v. Buffington,* 116 Or 399, 241 P 393, the plaintiff, according to its complaint, was an Idaho corporation. It sought the recovery of some sheep. The answer denied the averment concerning the plaintiff's corporate character. A verdict was returned in favor of the plaintiff and a judgment was entered thereon. Later, the defendant's motion for a new trial was granted and the plaintiff appealed. In holding that the trial judge erred in setting aside the judgment and ordering a new trail, this court engaged in the following comment:

"* * * In considering this phase of the case we have the anomalous situation of the defendant denying plaintiff's corporate existence and of its right to transact business, and yet demanding damages against it for wrongful detention of the sheep. Can defendant in one breath deny plaintiff's legal entity and in the next recognize its existence by asking judgment against it?"

The decision did not answer the question, for it held that the plaintiff had proved its corporate existence. However, Fletcher, Cyclopedia, Corporations, § 3910, declares:

"Subject to the limitations and exceptions already noted, it is well settled, barring a contrary rule in one state, that a person who contracts or otherwise deals with a body of men as a corporation thereby admits that they are a corporation, and is estopped to deny their incorporation, in an action

against him based upon or arising out of such contract or course of dealing.''

The limitations and exceptions to which the quoted words refer are not germane to the problem before us. The ''contrary rule in one state'' to which Fletcher referred, is that of Maryland. Fletcher includes among his numerous citations *New Idea Spreader Co. v. Satterfield,* 45 Ida 753, 265 P 664, and the plaintiff cites the same decision. The latter was based upon an action which was begun by a seller of a machine against the guarantors of the debtor. A nonsuit was granted because of a lack of proof of plaintiff's corporate existence. The instrument of guaranty identified the plaintiff as a corporation. Upon reversing, the court ruled: ''Having dealt with appellant as a corporation, respondent cannot deny its corporate capacity.''

None of our previous decisions determined a situation in which a party who had dealt with a business unit as a corporation later denied its corporate character, with the result that a court was required to determine whether or not the defendant had become estopped to challenge the plaintiff's corporate status. However, in *Nickum v. Burckhardt,* 30 Or 464, 47 P 888, 48 P 474, in which the decision held that the purported estoppel could not be considered because it was not pleaded, the court spoke of the doctrine as ''undoubtedly well founded in the law.''

In the present case, the defendant dealt with the plaintiff as a corporate entity and, upon being sued, filed a counterclaim. We take the following from 18 CJS, Corporations, § 113, p 519:

''* * * One who sues an alleged corporation as such thereby necessarily admits that it is a corporation, and is estopped to deny its corporate existence either in that action, or in a subsequent ac-

tion against the members or corporators on the same liability based upon the ground that the corporation was not legally organized, or in a subsequent action by the alleged corporation against him arising out of such prior action; and for the same reason a defendant is estopped to deny plaintiff's corporate existence by counterclaiming and asking judgment against it as a corporation.''

In *Bell v. Commercial Inv. Trust Co.*, 118 Okla 230, 246 P 1102, the essential facts were similar to those we are now considering. There, the Commercial Investment Trust Company brought an action against the defendant (Bell) upon a promissory conditional sales contract. The defendant, in addition to denying the plaintiff's corporate character, filed a counterclaim. The defendant recovered a judgment, and the sole issue upon appeal was whether or not the defendant was estopped to deny the corporate existence of the plaintiff. The court ruled:

"By her counterclaim for $1,000 against plaintiff, defendant estopped herself by the record and also admitted legality of plaintiff as a corporation."

*Mechanics Lumber Co. v. Yates American Machine Co.*, 181 Ark 415, 26 SW2d 80, represents a holding similar to that of the Oklahoma decision. That case also arose out of the sale of a machine. The Arkansas court wove together the two types of cases which we have been analyzing with the statement that the defendant's estoppel rested upon the twofold proposition: it had dealt with the purported corporation, and it had counterclaimed when sued.

■ Without resorting further to the authorities, we express the belief that it is well established that one who deals with an entity as a corporation is estopped from challenging its corporate character, and that a

defendant who is sued by a business unit which alleges its existence as a corporation and who includes in his answer a counterclaim, cannot, upon the trial, refute the averment concerning the plaintiff's corporate existence.

In the present instance, as we have seen, the defendant signed a contract with the plaintiff which described the latter as "Brandtjen & Kluge, Inc. (A Minnesota Corporation)". The abbreviation "Inc." when appended to the name of a business unit generally denotes a corporation and "is the equivalent of the phrase 'a corporation' ". *Andrews v. Spencer, Executrix,* 193 Or 615, 238 P2d 729. It is clear that the defendant dealt with the plaintiff as a corporation and, of course, it is a matter of record that, upon being confronted with a complaint which described the plaintiff as a corporation, he filed a counterclaim.

The question now presents itself: must the challenged ruling which ordered the nonsuit be affirmed because the plaintiff failed to sustain with evidence the controverted averment of the complaint which alleged plaintiff's corporate existence? We add that after the defendant had denied the allegation of the complaint which stated that the plaintiff is a Minnesota corporation, the plaintiff did not plead an estoppel. Generally, a party who seeks the benefit of an estoppel in pais must plead it, if he has an opportunity to do so. *Lane v. Myers,* 70 Or 376, 141 P 1022; Ann Cas 1915D 649; *Nickum v. Burckhardt,* supra; 19 Am Jur, Estoppel, § 179, p 832; and annotation 120 ALR 9.

The compiler of the valuable annotation in 120 ALR 9 says, at page 84:

"Another exception to the rule requiring estoppels or waiver to be pleaded is where the estoppel appears in the adverse party's pleadings; * * *."

Plaintiff's brief says:

"* * * The circumstances constituting estoppel being apparent on the face of the pleading the estoppel need not have been especially pleaded. McCleery v. Woodmen of the World, 136 Or. 407, 297 Pac. 345, 299 Pac. 1004."

However, the McCleery case was a suit in equity. The decision said:

"* * * This is a suit in equity and the reason that the complaint does not state the facts in the form of a plea in estoppel would not preclude plaintiff from establishing his right."

*Carlyle v. Sloan,* 44 Or 357, 75 P 217, was quoted to the effect that "Equity is not governed by such technical rules"; that is, that an estoppel must be pleaded. The McCleery decision, after having made that quotation from the Carlyle opinion, added:

"* * * If the matter constituting an estoppel is apparent on the face of the pleadings, it need not be specially pleaded to be available: * * *."

*Shaw v. Proffitt,* 57 Or 192, 109 P 584, 110 P 1092, employed reasoning similar to that of the decision just reviewed and reached a like result. It depended in part upon *Oregonian Ry. v. Oregon R. & N. Co.,* 22 F 245, 10 Sawy 464, which held that a party who has contracted with an entity as a corporation is estopped from denying its corporate existence.

Unlike the decisions so far reviewed, *Putnam v. Chase,* 106 Or 440, 212 P 365, which involved an issue concerning the duty of pleading an estoppel, was a law action. In the decision, Justice McBRIDE, with his characteristic practical sense, said:

"It is urged on behalf of defendant that there is no plea of estoppel in plaintiff's reply and that

as estoppel to be available should be pleaded, the objection of plaintiff cannot be sustained here. But it is also the law that where the matter constituting the estoppel appears on the face of the pleading it is not necessary to urge it by way of a technical plea; and such is the case here."

That decision was announced in 1923 and has been succeeded in law actions, as well as in equity suits, by more than thirty years of adherence to its good sense.

Although the McCleery decision seems to have limited to equity cases the rule that the party who wishes to avail himself of an estoppel need not re-plead the facts which estop, if they are already upon the record, it is apparent that the rule is actually broader and that it is employed in law actions as well as in equity suits.

■ Let us revert to the facts before us and see if they match the requirements of the rule of which we have taken notice. The plaintiff alleged its corporate existence. A copy of the contract which described the plaintiff as a Minnesota corporation was included in the complaint. The answer admitted that the defendant signed the contract; it pleaded a counterclaim. The plaintiff, in reliance upon the contract, shipped the machinery and paid the freight charges. It will be further damaged by being required to assume the charges for reshipment of the press to St. Paul if it cannot avail itself of the estoppel.

It is our belief that the estoppel was available to the plaintiff and that the failure of the plaintiff to produce upon the witness stand evidence of its corporate character cannot sustain the nonsuit.

We come now to the next proposition advanced by

the motion for a nonsuit: "The plaintiff has entirely failed to prove that a bill of lading was ever tendered to the defendant and refused by the defendant." It will be recalled that the complaint alleged that June 8, 1950, the press reached Pendleton and "the defendant was presented with a sight draft and a bill of lading * * * but the said defendant failed and refused, unjustifiably, to honor the same, or in any other way to pay for said equipment." Thus, the plaintiff alleged performance upon its part. It will also be recalled that the answer, in addition to denying the averment just quoted, set forth that after the contract was signed the plaintiff demanded that the defendant perform several acts unmentioned in the contract and announced that, unless the defendant performed those acts, the plaintiff would not install the press. Continuing, the answer alleged that "the plaintiff has refused to furnish a competent man to install said press unless the defendant would comply with the plaintiff's instructions." According to Biggs, the defendant's refusal to accept the press was due to the fact that the plaintiff had refused to install the press unless the defendant would perform the aforementioned extra services, which the contract did not exact nor even mention. Again, by reverting to matters stated in a preceding paragraph, it will be recalled that the contract provided that the balance of the purchase price was "payable in full on tender of bill of lading."

The allegation of the complaint that "the defendant was presented with a sight draft and a bill of lading" can mean nothing less than that those documents were shown or exhibited to the defendant. *Erdheim v. Mabee*, 305 NY 307, 113 NE2d 433.

We are not here concerned with tender in the sense

of a debt at due date, nor are we concerned with presentment, as the term is used in negotiable instrument law. The problem before us is to determine what was necessary to affix liability upon this defendant; that is, what did the words "tender of bill of lading" exact of the plaintiff. A contract pertaining to lumber which provided for "cash in exchange for document", according to *Weyerhaeuser Timber Co. v. First National Bank,* 150 Or 172, 38 P2d 48, 43 P2d 1078, implies "necessity for sufficient time to examine or check the documents, ascertain if the invoice corresponds with the order, if the inspection certificate is in proper shape and if the mate's receipt covers all the lumber described in the invoice." Therefore, if the situation required the plaintiff to "tender" a bill of lading to the defendant, it was essential that the plaintiff should have had the bill physically in the presence of the defendant so that the latter could inspect it. The Weyerhaeuser case decided nothing which governs the one at bar, but it helps to reveal the commercial reasons for inserting in contracts provisions which require the tender of such mercantile documents as bills of lading. Physical presence at the appointed time appears to be essential to the attainment of the provision's requirements.

In the present case, the evidence shows nothing more than that when the press reached Pendleton the carrier's freight agent telephoned to Biggs and told him that there was attached to the shipment a bill of lading which the defendant would have to pay before the carrier could deliver the press.

The question now occurs whether the telephone call constituted a sufficient physical presentment of the bill of lading. The plaintiff calls to our attention ORS

75.410 and 75.510 which are parts of the Uniform Sales Act. They read, respectively, as follows:

"It is the duty of the seller to deliver the goods, and of the buyer to accept and pay for them, in accordance with the terms of the contract to sell or trade."

"When the seller is ready and willing to deliver the goods, and requests the buyer to take delivery, and the buyer does not within a reasonable time after such request take delivery of the goods, he is liable to the seller * * *. If the neglect or refusal of the buyer to take delivery amounts to a repudiation or breach of the entire contract, the seller shall have the right * * *."

ORS 75.410 must be read in conjunction with 75.420, which says:

"Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions; * * *."

It is clear that in this case the parties "otherwise agreed"; that is, they rendered payment concurrent with the presentment of the bill of lading. We do not believe that the sections of the Uniform Sales Act, cited by the plaintiff, are decisive of the issue before us because those sections return us to "the terms of the contract" or to "the entire contract".

In aid of its argument against the necessity of a physical tender, the plaintiff cites *Lewis v. Craft,* 39 Or 305, 64 P 809, which was instituted to recover $300 which the plaintiff paid to the defendants on account of the purchase price of 200 head of cattle which the defendants agreed to deliver to the plaintiff, and also to recover damages for the alleged wrongful failure to deliver the cattle. According to the plaintiff, the cattle were to be delivered to his home and he was then to

pay the balance of the purchase price. The plaintiff testified that after the contract was made the number of cattle sold was reduced to 184 and the place of delivery was changed. He claimed that the defendants failed to make delivery of the cattle although he tendered payment of the balance of the purchase price. The defendants admitted that they had agreed to sell the plaintiff 200 head of cattle, and swore that they tendered the required number to the plaintiff at the appointed place, but that he failed to make payment. The testimony given by the parties was in disagreement as to (1) the place of delivery; (2) whether or not the plaintiff tendered payment of the balance due; and (3) whether or not the defendants tendered delivery of the cattle. The case did not concern a bill of lading or the tender of one. The plaintiff had judgment, which was reversed in the decision under review. In reversing judgment, this court held that all that the parties were required to do under their contract was to offer to perform, and that if the plaintiff refused a conditional offer of the cattle he breached the contract. The decision does not help us in the case at bar, for it does nothing more than hold that all that the parties were required to do was to perform that specific contract.

Plaintiff also cites *Anderson v. Wallowa National Bank,* 100 Or 679, 198 P 560, in which the plaintiff conveyed to the defendants 1800 acres of land November 8, 1915, and was thereupon appointed exclusive agent until June 1, 1916, to sell the land for not less than $13,887.96. Under the agreement, the plaintiff would receive as commission any sum paid in excess of $13,887.96. The plaintiff claimed that he found a buyer who was willing to pay for the land $32,500 in cash, but that the defendants refused to do anything

whatever until after June 1, 1916. The defendants denied that they were unwilling to proceed until after June 1, 1916. Plaintiff's action sought recovery of the difference between $32,500 and $13,887.96. In the trial court he recovered judgment. In reversing, this court held that payment of the money and delivery of the deed were concurrent acts which had to be performed simultaneously. It added: "Unconditional tender by either party is not required in any event, and affirmative offer to perform is excused on behalf of either party, if the other has already refused to comply with the contract." Further, the decision declared: "The payment or offer to pay is excused, however, if the defendants refused to receive the money or refused in advance to perform the contract. * * * No one is required to do a vain thing, and, if the defendants would not do anything until after June 1st, the tender was excused." The plaintiff seeks to use that decision to equate tender of performance with "tender of the bill of lading" under the contract at bar. The decision does not sustain the plaintiff's effort.

The two decisions just reviewed do not indicate whether or not the telephone message from the freight agent was a sufficient presentment of the bill of lading. If it was sufficient, the evidence shows that the plaintiff proved its allegation, and the nonsuit cannot be sustained. If it was not sufficient, we must go on to other important issues. The plaintiff, as we have seen, argues that its allegation was sustained by proof of something less than a manual presentation of the bill of lading. The defendant, upon the other hand, urges that "tender of the bill of lading" required nothing less than a manual presentation. Commercial practices very likely favor plaintiff's position. The plaintiff was located in Minnesota and, so far as we can

ascertain from the meager information before us, it did its business in this state through a traveling salesman. We have taken note of the fact that the press was sent to Pendleton with a bill of lading attached. The press and the bill of lading remained in Pendleton for several days. The carrier was the plaintiff's means of transportation and for doing the acts essential to delivery. It would seem unreasonable and contrary to commercial practices to require any manufacturer in a situation such as the plaintiff's to employ a messenger to carry a bill of lading from the freight warehouse to the purchaser's place of business for the sole purpose of exhibiting it.

The plaintiff, however, appears to be unwilling to rest its case upon the line of thought just portrayed, and claims that its allegation of presentation of the bill of lading was immaterial and that, therefore, it was not required to support the allegation with proof. It cites ORS 16.610, which reads:

> "A material allegation in a pleading is one essential to a claim or defense, and which could not be stricken from the pleading without leaving it insufficient as to such claim or defense."

After citing that section, the plaintiff asks: "Can there be any doubt that the allegations regarding presentment and dishonor could have been stricken without affecting the cause of action in the least?" Four elements constituted the plaintiff's cause of action: (1) the contract; (2) performance by the plaintiff according to the terms of the contract; (3) refusal by the defendant to perform; and (4) resulting damages. "Performance by the plaintiff according to the terms of the contract" is crucial to the contention under review and to the plaintiff's right to recover. If we strike

from the complaint the words which the plaintiff now believes are nonessential, the material part of the complaint would read: "That on or about June 8, 1950, said equipment arrived at Pendleton, Oregon, by freight, and the defendant * * * refused * * * to pay for said equipment in accordance with the terms of the contract * * *." When the complaint is stripped down to those remnants, it would allege a delict by the defendant but fail to aver performance by the plaintiff; that is, tender of the bill of lading. As we have said, the contract is a part of the complaint and it conditioned the defendant's liability in this way: "Cash payable on tender of bill of lading". Therefore, if the words which the plaintiff at this time deems surplusage are discarded, the complaint would not state a cause of action.

The contract between the parties must be read as a bilateral agreement to sell and to buy. Tender of the bill of lading was antecedent to the concurrent duties of delivery by the plaintiff and payment by the defendant. Although the complaint alleged a tender of the bill of lading, the plaintiff's brief argues that, due to facts developed by the evidence and shown by the pleadings, the plaintiff was excused from actual tender of performance and is entitled to damages against the defendant, although it did not manually present to the defendant the bill of lading. In other words, the plaintiff claims that even though it did not perform the conditions of the contract, the defendant is, nevertheless, liable.

We shall now take note of the circumstances upon which the plaintiff depends. We have seen that the answer alleged that May 25, 1950, the defendant received a letter of instructions from the plaintiff directing the defendant, upon receipt of the press, to perform

many services that were not required by the contract. According to the answer, the letter stated that, unless the defendant complied with the directions, the plaintiff would not install the press. Continuing, the answer affirmed that at that juncture the defendant telegraphed to the plaintiff a demand that it perform the contract according to its terms or cancel the order for the press. The purported letter and the telegram were not produced at the trial, and the record contains scant information as to their contents. It is evident from Biggs' testimony that he was unfamiliar with the terms of the contract when he sent the telegram and that he had inferred that the contract required the plaintiff, unconditionally, to install the press. Further, the testimony indicates a belief that the defendant was not required to pay the balance of the purchase price until the press was installed in the shop and was operating to the defendant's satisfaction.

The contract contained these provisions:

"A competent man to install said equipment, to be furnished by vendor, his expenses, while so engaged, to be borne by the seller.

"Vendee agrees to have equipment placed on shop floor. If necessary for vendor to dis-assemble and re-assemble press and equipment, the vendee agrees to pay this expense at the rate of $3.25 per hour.

"Vendee agrees to make all necessary electrical connections and pay the expense thereof, and to furnish all help necessary at vendee's expense to erect above mentioned equipment."

The contract also contained the three stipulations of which we have taken notice which required payment of the unpaid part ($2,978.69) of the purchase price before the plaintiff was required to release the press.

Biggs, as a witness for the plaintiff, swore that when the freight agent told him that the press had arrived in Pendleton and that the bill of lading would have to be paid before the press could be delivered, he did nothing whatever. Continuing, he explained:

"I never made any inquiries in regard to picking it up. Everything was all right until I received this supplemental contract or letter or whatever you might call it, instructing us to remove it, uncrate it, put it in place, and look for broken parts, so on and so forth."

Since "this supplemental contract or letter" was not produced, we cannot know from that source whether the purported demands were made. In the testimony which follows, Biggs accounted for his refusal to pay for the press:

"A My understanding was that the price included installing, and when installed, it was to operate to our satisfaction, and then we were to pay for it.

"Q That you were not to pay for it until after it was running to your satisfaction, is that right?

"A It was to be installed.

"Q You refused to take it from the depot until after it was installed?

"A I couldn't take it; I was willing to remove it at any time, whenever they wanted to comply with their contract to install it; I was always ready and willing to pay for it after it was installed and running to our satisfaction.

"Q You did refuse to pay for the machinery, and to set it up on the floor yourself; you did refuse to do that, didn't you?

"A You mean the bill of lading?

"Q Yes.

"A I was never presented with a bill of lading.

"Q Didn't you tell Brandtjen & Kluge that you wouldn't put it on the floor until it was installed?

"A Whatever I wired them in response to their letter. I can't just remember what the wire says.

"Q Wasn't it your position at that time that you would not pay for the machinery until after it was installed on the floor, isn't that right?

"A That is my understanding; that is the way I planned it.

"Q That is what you told them?

"A Yes. Whenever it was installed and running to our satisfaction like other equipment, then we were willing and ready to pay for it.

"Q Not until that was done?

"A Not until installed and running, that is right."

Thus, the testimony, showing that it would have been vain to have presented the bill of lading to the defendant, came from the individual who signed the defendant's signature to the contract and who managed the defendant's business. There is no contention that Biggs misspoke himself or that his testimony does not represent the truth.

■ It is well established that performance of a condition precedent or concurrent may be excused on the part of a party, such as the present plaintiff, if the other party to the contract gives notice beforehand that he will not perform his part of the undertaking. *Dibble v. Hodes Co.,* 132 Or 596, 277 P 820, 286 P 554; *Anderson v. Wallowa National Bank,* supra; *Schucking v. Young,* 78 Or 483, 153 P 803; *Browne & Co. v. Sharkey,* 58 Or 480, 115 P 156; *Lewis V. Craft,* supra; Williston on Contracts, §§ 676, 698a and 698b; Williston on Sales, §§ 578 and 586; Restatement of the Law, Contracts, § 280. In the *Browne & Company* case, the plaintiff was the assignee of one Lewis M. Head, a printer

who had contracted with the defendant to print a booklet. Head had completed virtually all of the work with the exception of the stitching, but the defendant had refused to furnish an insert which the contract demanded he should supply and, also, according to the decision, he had refused "to receive the booklets or pay for them." In sustaining the defendant's liability, this court said:

"Plaintiff was not required to make a physical tender of the books in a complete state after defendant had notified him that it would not receive them in any event."

From the Schucking decision we take the following:

"It further appears from plaintiff's testimony that upon the 8th of November, 1913, plaintiff said to defendant: 'Eph, it is getting pretty late. Can you tell me when you are going to be ready to deliver so that I will be there?' and that defendant answered: 'I am not going to deliver. You don't think that contract of yours is any good?'—to which plaintiff replied, "I most certainly do.' Whereupon defendant answered, 'Well it is not.' Accepting this testimony as true, as we must after verdict, plaintiff has shown a compliance with every condition of his contract so far as defendant's conduct has permitted him to do so, and has disclosed a good right to recover unless he has failed to show his ability to have paid for the hops had defendant complied with his part of the contract; it being the settled law of this state that a declaration by one party to a contract made prior to the time fixed for the performance that he will not comply with such contract, if not withdrawn, may dispense with or excuse an offer to perform by the other party before bringing the action, although it does not ordinarily excuse ability to perform: *Longfellow v. Huffman,* 49 Or. 486 (90 Pac. 907); *Krebs Hop Co. v. Livesley,* 55 Or. 227 (104 Pac. 3)."

The Dibble decision declares:

> "It is a general rule that where a party, bound by an executory contract, repudiates his obligation before the time for performance, the promisee (in the present case the plaintiff) has, according to the great weight of authority, an option to treat the contract as ended, so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach: \* \* \*."

The defendant clearly repudiated the contract before the day had come for the plaintiff to tender the bill of lading. A tender of the latter would have been a vain and useless act.

█ But, as we have seen, the complaint alleged performance and was silent upon the subject of waiver. The answer, however, rendered it clear that the defendant had misinterpreted its contractual rights and had reached a conclusion which would have rendered useless a tender of the bill of lading. That such was the attitude of the defendant became manifest when Biggs gave the testimony which is set forth upon a preceding page.

When the motion for a nonsuit was made, the plaintiff did not move to amend from performance to waiver. However, as we have seen, the answer itself supplied many of the facts which showed waiver. The evidence which established waiver did not come from witnesses who testified over objections but from Biggs himself.

ORS 16.630 says:

> "No variance between the allegation in a pleading and the proof shall be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it shall be alleged that a party has been so misled, that fact shall be proved to the satisfaction of the court, and in what respect he has

been misled; and thereupon the court may order the pleading to be amended upon such terms as shall be just.''

In *Ridley v. Portland Taxicab Co.*, 90 Or 529, 177 P 429, Mr. Justice HARRIS gave the following enlightened pronouncement:

"Even though a complaint omits some material allegation a motion for a directed verdict, based upon the fact of such omission, should be denied, especially where the objection can be cured by an amendment and the plaintiff's evidence, if true, makes a case against the defendant: Meyers .v. Syndicate Heat & Power Co., 47 Wash. 48 (91 Pac. 549); Gerke v. Fancher, 158 Ill. 375 (41 N. E. 982); Cahill v. Illinois Cent. R. Co., 137 Iowa, 577 (115 N. W. 216); Wrought Iron Bridge Co. v. Greene, 53 Iowa, 562 (5 N. W. 770); Austin Western Co. v. Weaver Tp., 136 Iowa, 709 (114 N. W. 189).

"Of course a different question would be presented and a different result might follow if the evidence conclusively showed that the plaintiff was without a cause of action. It must be remembered that a judgment on a directed verdict concludes the controversy; and hence if it is permissible to direct a verdict for a defendant merely because the complaint has omitted some material allegation, which can be supplied by an amendment, and in despite of the fact that the plaintiff has offered evidence which would be sufficient to support a verdict for him if accompanied by a good instead of a bad complaint, it would result in defeating the purpose of amendments and frequently would end in the complete denial of a right by the simple but indefensible act of closing the doors to the truth. If, therefore, the record brought to us contains evidence which, when accompanied by a good pleading and if believed by a jury, would be legally sufficient to support a verdict for the plaintiff, then it was error to allow the motion for a directed verdict on account of any failure of the complaint to allege that the

defendant knew or ought to have known that it furnished a defective wrench.''

We are satisfied that the plaintiff's evidence established a cause of action and that the nonsuit should not have been granted. Likewise, the counterclaim should not have been awarded. The assignment of error under review is sustained.

The challenged judgment is in error. It is reversed.

When the cause is remanded, the plaintiff should be afforded opportunity to amend. Before closing we add that the attorneys who represented the plaintiff upon appeal are not those who represented it in the trial court.