Argued April 4, modified and remanded June 22, 1972

BELLEVILLE, *Respondent, v.* DAVIS, *Appellant.*

498 P2d 744

*George M. Joseph,* Portland, argued the cause for appellant. With him on the briefs were Bemis, Breathouwer & Joseph, Portland.

*Frederick T. Smith,* Portland, argued the cause for respondent. With him on the brief were Dusenbery, Martin, Bischoff & Templeton, and David P. Templeton, Portland.

TONGUE, J.

This is a suit for specific performance of a contract for the sale of a one-half interest in a Broadway Cab. The complaint also prayed for actual and punitive damages. The trial judge entered a decree of specific performance against both defendants and awarded $1,000 in punitive damages against defendant Marvin Davis, who is the sole appellant in this court.

The first and primary issue to be decided is whether, under the evidence, plaintiff was entitled to a decree of specific performance against defendant Marvin Davis. It thus becomes necessary to review the evidence.

Prior to June 1969 Marvin Davis was the owner of Broadway Cab No. 85, together with membership in Broadway Deluxe Cab Company, common stock in Broadway Cab Company and membership in the B. C. Mutual Benefit Association. "Sometime in the latter part of June" Marvin entered into an oral agreement to sell all of these interests to his brother. The testimony is not clear as to the terms of that oral agreement as discussed and agreed upon at that time. There was testimony, however, that Robert agreed to pay $15,500 to Marvin, including payment of $1,000 as a down payment "as quick as * * * he could." Robert also agreed to pay Marvin's payment to "the company," in the sum of $100 per month, as due by Marvin to the company,

plus some additional "excess interest payment" to Marvin.[1]

There was some evidence, however, that at that time there was a "standard form" of conditional sales contract for the sale by a Broadway Cab driver of his interest in his cab. There was also evidence that it was then understood that Robert could resell a half interest in the cab (the "night half") and that, in such an event it was required that Marvin give his approval for such a sale.

Shortly after July 1, 1969, the cab required substantial repairs and then broke down completely, so as to require the purchase of a new cab in August 1969.[2] Robert was then "far in the hole" and had to "do something." By that time he had apparently been "voted in" as a member of the company and association.

Robert then made an agreement to sell a one-half interest to plaintiff for the sum of $8,250 and an agreement that plaintiff could operate the cab on a 3 p.m. to 3 a.m. ("3 to 3") shift. On or about September 21, 1969, prior to the preparation of written contracts, the cab was turned over to plaintiff to operate on that shift.

In September, also prior to the written contracts, Robert reported the proposed arrangement to Marvin and testified that "he said that [it] was fine, [but] that he didn't want it in writing." There is also

---

[1] The record does not reveal whether the payments due by Marvin to the company were for the original purchase of the cab as a vehicle, for stock in the corporation, or for some other obligation then due by Marvin to the company.

[2] Again, the details of how the purchase of that cab was to be financed and purchased, including arrangements for payments, is not clear in the record.

evidence, however, that although Marvin told Robert that plaintiff "could work three to three, that's fine," Marvin said that he "wanted the shift from six to six."

The agreement for the sale of the one-half interest by Robert to plaintiff was then reduced to writing in a contract prepared by Robert's attorney. That contract also specified that plaintiff was to have the right to operate the cab on a "3 to 3" shift. Robert's attorney also prepared a separate "operating agreement" between Robert and plaintiff for shift hours on a "3 to 3" basis, as well as a written contract to confirm the previous sale by Marvin to Robert of Marvin's entire interest to Robert, to be dated as of July 1, 1969.

Robert and plaintiff then signed the agreement for sale of the one-half interest and the "operating agreement," both as of October 1, 1969. The agreement for sale by Marvin to Robert was not signed by Marvin, however. Neither did Marvin sign his "approval" of the sale of the one-half interest by Robert to plaintiff in the space indicated in that agreement for his signature. It appears, however, that beginning on about September 21, 1969, and continuing for about two months plaintiff was not only permitted to operate a "3 to 3" night shift, but that during at least a part of that same period Marvin himself operated the day shift.

Plaintiff testified that in "early November" (after the signing of the written contracts) Marvin returned the cab late one day and then asked plaintiff "what hours Bob had sold me" and that about two weeks later Marvin said that Robert didn't have a right to sell a "3 to 3" shift, but to "go ahead and operate it, but I won't put it in writing." Robert also testified that Marvin told him that "he didn't care

what hours [plaintiff] worked * * * as long as it wasn't in writing on the contract." Marvin testified that he objected to the "3 to 3" shift and wanted the "6 to 6" day shift, but that he didn't care whether Robert and plaintiff had made an agreement under which plaintiff was to operate a "3 to 3" shift "as long as it was a verbal deal until my contract was satisfied" and he would be "out of it." He also admitted that he "probably" told plaintiff that plaintiff could have any verbal agreement with Robert that he wanted.

Meanwhile, Robert had not paid to Marvin the $1,000 "down payment" and admitted that he had not paid anything to Marvin at the time of his sale of the one-half interest to plaintiff.

Plaintiff, however, paid to Robert $500 as "earnest money" and also paid $700 as the balance of his "down payment" of $1,200 after he was "voted in" as a member, either in September or October. Robert used the $500 for repair bills and did not pay any part of that $1,200 to Marvin.

Under that agreement plaintiff also was to pay $100 per month as a monthly payment, plus interest. When plaintiff undertook the operation of the "3 to 3" shift, Marvin acted as his bookkeeper, to prepare his income and expense statements for operation of the cab. Marvin admitted that all of those monthly payments by plaintiff were applied on Marvin's account at the Broadway Taxicab Company.[9] Those payments were made by check from plaintiff to Robert and were endorsed by him so that they could be "applied to Marvin's account."

In December 1969, according to plaintiff's testi-

---

[9] As stated in note 1, the basis for this account is not explained in the record.

mony, Marvin came to him and said he "wasn't going to honor [my] contract; that he and Bob Davis had not signed any contract, and, therefore, I didn't own anything and he was going to see to it that I didn't get any 3 to 3 cab." Plaintiff testified that Marvin also told him that Robert was falling behind in his payments and that until then plaintiff did not know that Robert was delinquent in such payments. Plaintiff had previously known, however, that Robert had bought the cab from Marvin.

The next thing that happened was that a meeting was arranged "sometime in January or early February" by Marvin with Robert and plaintiff at the office of Marvin's attorney, Francis Harrington. Just what happened at that meeting does not appear, but Mr. Harrington then prepared a written contract for the sale of all of Marvin's interest in the cab to Robert for $15,500, effective as of July 1, 1969, as well as a promissory note for $650 from Robert to Marvin, with the first monthly payment of $50 due on April 10, 1970.① The contract and note were signed by Robert on March 10 or 11, 1970. The contract was also signed by Marvin.

About April 15, 1970, Mr. Harrington sent a letter to Robert, "calling [his] attention to a default in the contract of March 11, 1970" and "asking [him] to bring it current." In addition, no payment had been made on the promissory note. Although plaintiff had made his monthly payments to Robert for each month, to and including April, Robert had not turned over the April payment to the company.

① It appears that the note for $650 may represent the "difference in interest between interest due on [his] obligation to Broadway Cab and the interest due on the balance of the purchase price of the cab."

By letter dated April 23, 1970, Mr. Harrington sent to Robert a notice that Marvin had elected "to declare the entire balance of the purchase price immediately due and payable" and that unless paid by 5:00 p.m. of the next day he would repossess the cab. Upon Robert's failure to pay, the cab, a 1969 Chevrolet 4-door sedan, was then repossessed. Since then the cab has been held by Marvin, but has not been sold on foreclosure so as to charge or credit any deficit or excess to either Robert or plaintiff.

On May 22, 1970, plaintiff filed a complaint for specific performance of his contract to purchase a one-half interest in the cab, naming both Robert and Marvin as defendants.

*The pleadings and the evidence were sufficient to support the decree for specific performance.*

After hearing and considering the foregoing evidence the trial judge made a finding of fact that the sale of the one-half interest in the cab by Robert to plaintiff "was assented to by Marvin" with the result that Marvin became "subject to" the terms of that agreement. The trial judge also found that the one-half ownership in the cab, with related rights of operating and membership, was "unique" and that plaintiff was entitled to specific performance by both Robert and Marvin of plaintiff's contract for purchase of that one-half interest.

After reading the record we agree with these findings. We do so on the ground that the preponderance of the evidence is that Marvin not only had delivered possession of the cab to Robert and was not only informed by Robert of his proposed sale to plaintiff, but expressly assented to that sale. At that time

Robert was delinquent in payments under his previous oral contract with Marvin. Although Marvin may have been disturbed by the fact that the sale of the one-half interest included the right to operate a "3 to 3" night shift, the preponderance of the evidence is that Marvin told both Robert and plaintiff that the sale was "fine," although he didn't want it in writing.

In addition, Marvin was informed of the proposed sale, including reference of the "3 to 3" shift, prior to the signing of the contract for that sale on October 1, 1969. Instead of informing either Robert or plaintiff that he would not consent to such a sale, the evidence shows that beginning on or about October 1, 1969, and continuing for nearly two months Marvin knew that plaintiff was not only purchasing a one-half interest in the cab, but was operating it on a "3 to 3" shift. Indeed, it appears that Marvin operated the cab during the day shift for at least some portion of that period and acquiesced in that arrangement. It also appears that beginning in October the $100 monthly payments made by plaintiff to Robert were applied to the account of Marvin with the company.

■■ We hold that this evidence was sufficient to establish that Robert had actual authority from Marvin to sell the one-half interest to plaintiff, based upon the consent of Marvin. Under this view, since Robert had actual authority from Marvin to make the sale, rather than only apparent authority, it is immaterial whether plaintiff knew at that time of Marvin's interest in the cab (which he denied), so as to preclude him from being a bona fide purchaser. See Annot., 47 ALR 85, 92-93 and Annot., 88 ALR 109, 112.

■ We also hold that the evidence was sufficient to establish an intentional waiver by Marvin of any

right to withhold his consent to that sale. As held in *Cross v. Campbell,* 173 Or 477, 493, 146 P2d 83 (1944), under somewhat similar facts, "* * * [s]uch waiver may be proved by parol and by circumstantial evidence, as well as by direct testimony." See also *Christenson v. Nelson,* 38 Or 473, 477, 63 P 648 (1901), and *Waterway Terminals v. P. S. Lord,* 242 Or 1, 26-27, 406 P2d 556 (1965).

■ In addition, we hold that the evidence was sufficient to establish an estoppel against Marvin to claim or exercise any right to withhold his approval of that sale.[5] As held by this court in *Ruddy v. Ore. Auto. Credit Corp.,* 179 Or 688, 703, 174 P2d 603 (1946), quoting from 31 CJS, Estoppel § 91; p 501:

> "Where one who owns or has an interest in personal property, with full knowledge of his rights, suffers another to deal with it as his own by selling or pledging it, or otherwise disposing of it, he will be estopped to assert his title or right as against a third person who has acted on the faith of, and has been misled by, his acquiescence."

See also Prosser, Torts 691-694, § 105 (4th ed.)[6]

---

[5] No contention is made in this case relating to the application of the Uniform Commercial Code, which expressly recognizes the principles of equity such as estoppel, as supplementing its provisions, unless displaced by particular provisions of the UCC (ORS 71.1030) and also expressly recognizes the right of a buyer to specific performance "where the goods are unique" (ORS 72.7160).

Also, with reference to possible application of the UCC, it should be noted that Marvin's previous sale to Robert, although claimed to be a conditional sales contract, was not only oral, but no security interest was ever perfected or claimed by Marvin.

[6] The law of estoppel, as applicable in such a case, is well stated in Prosser, Torts 692-93, § 105 (4th ed) as follows:

> "Such equitable estoppel may be separated into two branches. The first is based upon some definite misrepresen-

Defendant Marvin Davis contends that plaintiff is not entitled to recover on a theory of consent, waiver or estoppel because those theories were neither pleaded nor considered by the trial court and that plaintiff's

tation of fact, made with reason to believe that another will rely upon it, upon which the other does rely in changing his position to his prejudice. Perhaps because of the equity origin of the doctrine, such misrepresentation has not been identified with that required for the action of deceit, but rather with that necessary for equitable relief. Although there are occasional decisions to the effect that estoppel cannot arise unless the party estopped had knowledge of the falsity of his statements, or was at least negligent in making it, it seems to be quite clearly established that entirely innocent misrepresentation may be sufficient. It is the inequity of seeking to take advantage of another's position resulting from a misleading statement which is the basis of the relief.

"The second branch does not depend upon positive misrepresentation, but is based upon a mere failure to take action. It arises where the party 'stands by' and allows another to deal with his property, or to incur some liability toward him, without informing the other of his mistake. Thus he may not remain silent when he sees his goods sold to a stranger, or improvements made upon his land, and still enforce his rights against the innocent wrongdoer. The law of estoppel creates a duty to speak, under penalty of loss of the right to assert the truth at a later time. Since in such a case there is no active misleading of the other party, who has misled himself, the courts have insisted upon some fault in connection with the conduct of the one to be estopped. There is no estoppel where he had remained silent reasonably and in good faith; he must be aware of his rights, and must realize that the other is about to act under a mistaken belief. Thus this branch of estoppel requires either an intent to mislead or unreasonable conduct amounting to negligence in failing to act, rather than the strict responsibility imposed in estoppel by misrepresentation."

In this case the evidence supports a finding that Marvin acted with an intent to mislead plaintiff and also that Marvin had a duty to speak under the circumstances and that his conduct was at least "unreasonable conduct amounting to negligence in failing to act."

See also First National Bank v. Stretcher, 169 Or 532, 538, 129 P2d 830 (1942), and Marshall v. Wilson, 175 Or 506, 518, 154 P2d 547 (1944).

complaint proceeded instead on the theory of a scheme to defraud, with a theory of novation also urged by plaintiff at the time of trial.

We agree that plaintiff's evidence was not sufficient to establish a "scheme" to defraud. It was also insufficient to establish a novation.[⑦] We do not agree, however, that plaintiff's complaint was not sufficient to sustain recovery on a theory of consent, waiver or estoppel.

It is true that the words, "waiver" and "estoppel" do not appear in plaintiff's complaint. The complaint does allege, however, that the payments made by plaintiff under his contract for the sale of a one-half interest in the cab, as well as his operation of the cab were "with the knowledge and consent—and without objection of defendant Marvin Davis."

The complaint also alleges, among other things, that Robert represented that he was the owner of the cab; that Marvin knew or should have known of that representation by Robert; that plaintiff, in reliance on that representation, entered into the purchase agreement with Robert and paid him a $1,200 down payment, as well as further monthly payments; that such payments, as well as plaintiff's operation of the cab were with the consent and knowledge of Marvin and without objection by him; and that "said acts and representations were intentional and malicious."

█ It is established in Oregon that equity is not governed by such technical rules of pleading and that if the matter constituting an estoppel appears on the face of the pleadings it need not be specially pleaded

---

[⑦] Plaintiff did not prove that Marvin intended to substitute plaintiff in place of Robert, as required for a novation. Credit Bureaus v. Cox Brothers, 207 Or 253, 257-58, 295 P2d 1107 (1956).

to be available. *Brandtjen & Kluge v. Biggs,* 205 Or 473, 483-84, 288 P2d 1025 (1955), and cases cited therein. The same is true of waiver. See *Jaloff v. United Auto Indemnity Exch.,* 121 Or 187, 195, 253 P 883 (1927), and cases cited therein.

■ We hold that for the purposes of a suit in equity for specific performance of a contract, as in this case, and in the absence of a motion or demurrer, the foregoing allegations were sufficient, when supported by evidence, as in this case, to support a decree of specific performance against both defendants, including a decree against Marvin on any of the following theories: (1) that Marvin had expressly consented to the sale; (2) that Marvin had waived his right to object to the sale, or (3) that Marvin was estopped from denying that he had consented to the sale. Cf. *Rose v. Robinson,* 174 Or 25, 36, 40-45, 147 P2d 204 (1944).

■ It is also true that the theories of waiver and estoppel do not appear to have been expressly urged by plaintiff in the trial court, although the theory of consent to the sale was apparently urged by plaintiff in his brief to the trial court. Again, however, this court has recognized an exception to the general rule that a plaintiff "is bound in this court by the theory pursued below" where the record is complete, so that no additional or different proof would have been available to the opposing party, and the alleged "new theory" was fully argued by both parties on appeal in this court. See *Hanscom v. Irwin,* 186 Or 541, 558-59, 208 P2d 330 (1949).

The "theory" that Marvin consented to the sale and that he was estopped to deny such consent were argued by both parties in their briefs in this case. While no express mention was made of the "theory"

of waiver, that theory is so closely related to estoppel as to sometimes be referred to as "waiver by estoppel," despite distinctions between the two. *Reed v. Commercial Ins. Co.,* 248 Or 152, 155, 432 P2d 691 (1967).

Defendant Marvin Davis also contends that plaintiff cannot claim that he "relied on said misrepresentations" by Robert because plaintiff also contended that he did not know of Marvin's interest until "after the deal was consummated." Since, however, there was evidence that Marvin consented to the sale and waived his right to object to it, it was not necessary for plaintiff to prove such reliance. And, even under a theory of estoppel, in which reliance is an element, the evidence was that Marvin remained silent when he knew of the sale by Robert to plaintiff and had a duty to speak if he intended to object, with the result that he was estopped by his acquiescence under these circumstances. In other words, even though, at that time, plaintiff had no knowledge of Marvin's interest, he was entitled to rely on Robert's representation that he was the owner of the cab, with the right to sell it, and since the evidence was that Marvin not only failed to object, but consented to the sale, he is now estopped to contend to the contrary.⑧

■ In addition, it is contended that the remedy of specific performance of the sale of the one-half interest

---

⑧ It is also contended that Marvin did not know of any representations by Robert. The preponderance of the evidence, however, was that Marvin was not only informed by Robert of the proposed sale, but consented to it. It may be, as also contended, that there is a distinction between the sale of a one-half interest in a cab and the sale of a "3 to 3" operating shift. Again, however, the preponderance of the evidence was that although Marvin at first questioned the "3 to 3" shift, he nevertheless consented to the sale, with full knowledge that it included the "3 to 3" shift, and only declined to "put it in writing."

in the cab, with related interests, was not a proper remedy, at least against Marvin. We hold, however, that in a court of equity such a remedy was entirely appropriate under the facts of this case. The effect of the decree is that Marvin must recognize plaintiff's ownership of a one-half interest, based upon the sale of that interest to plaintiff by Robert, with the consent of Marvin. Defendants are still entitled to demand that plaintiff pay the unpaid balance due under that contract. The decree does not purport to decide Marvin's rights against his brother Robert.

*The record was insufficient to support the award of general or punitive damages.*

Plaintiff's amended complaint alleged that by retaking the cab and denying plaintiff the "right to earn his livelihood," he had been damaged in the sum of $2,000. In support of that allegation plaintiff testified that during the four months prior to the repossession he earned $40 per shift "gross" and $25 per shift "net" from the operation of the cab and that he worked five or six shifts per week.

Defendant contends that this testimony was insufficient as the basis for an award of damages for lost income and that there was no evidence of what plaintiff had earned after the repossession and prior to trial. Defendant also contends that, in any event, it does not appear that the trial court assessed and awarded any actual damages.

Thus, it is significant to note that even if it be assumed that plaintiff's evidence was sufficient to establish a prima facie case of damages for loss of income or loss of profits, the trial court made no finding of fact or conclusion of law that plaintiff had

suffered damages for loss of income or "livelihood." Instead, the trial court held, as a conclusion of law, that "Plaintiff is entitled to have both defendants specifically perform, and in accordance thereto they are required to deliver up a fully paid one-half interest in the cab at this time." The decree then ordered defendants "to credit the account of the plaintiff as though all payments had been made by the plaintiff in due course * * * leaving a balance due * * * under the contractual agreement in the amount of $4,950.00 as of the date of the next payment, July 1, 1971."⑨

Plaintiff does not deny defendant's contention that the trial court made no award of damages. Instead plaintiff contends that:

"We submit there is sufficient evidence to demonstrate that plaintiff has always earned enough to make all of the payments on the cab as they fell due and that plaintiff would have continued to make his payments had Marvin allowed plaintiff to continue operating the cab. Plaintiff should get the one-half interest in the cab that he bargained for paid up to the date that it is returned to him."

■ Plaintiff cites no cases or authorities in support of the award of a "paid-up" one-half interest in the cab as an incident to a decree for the specific performance of a contract for its sale.⑩ In addition, in this

---

⑨ As of the date of repossession in April 1970, the contract balance was $6,350. The trial court apparently deducted from that amount a sum equal to $100 per month from that date until the date of the decree in July 1971, some 14 months later, or an allowance to plaintiff of a "credit" in the sum of $1,400.

⑩ Cf. Clarno v. Grayson, 30 Or 111, 144, 46 P 426 (1896), and Kuratli v. Jackson, 60 Or 203, 213, 118 P 192, 118 P 1013 (1911). See also Bennett Veneer Factors v. Tomco, 256 Or 547, 551, 474 P2d 519 (1970). But see Caveny v. Asheim et al, 202 Or 195, 218, 274 P2d 281 (1954), and 2 Restatement of the Law, Contracts 638 and 659, §§ 359 and 365.

case plaintiff knew that Marvin had not signed his "approval" of the written contract. Thus, plaintiff had reason to anticipate possible difficulties in obtaining specific performance of the contract, even though he was led to believe that Marvin consented to the sale of a one-half interest in the cab, including the "3 to 3" shift.[11] It is also doubtful whether there were sufficient allegations in the amended complaint to support the award of a "paid-up" one-half interest in the cab. Instead, the complaint prayed for a judgment for damages.[12]

Furthermore, an award of damages as ancillary relief in a suit in equity for specific performance is given only in exceptional cases.[13] Although this might qualify as an exceptional case, the trial judge made no award of damages. The proof of damages based upon evidence of past profits, even if sufficient to make a prima facie case, was such that we do not know whether, as trier of the facts, he would have made such an award. Furthermore, to now modify the decree by substituting an award of damages for the award of a "paid-up" contract would be contrary to the rule that a respondent who has not cross-appealed cannot ordinarily obtain the modification of a decree in a manner favorable to himself.[14]

---

[11] This is consistent with the rule that a purchaser who has knowledge of defects in title or subject matter is not ordinarily entitled to compensation or abatement of the purchase price as an incident to equitable relief, even though entitled to a decree of specific performance. See Caveny v. Asheim et al, 202 Or 195, 221, 274 P2d 281 (1954). Cf. 2 Restatement of the Law, Contracts 660, § 365.

[12] But see Caveny v. Asheim et al, 202 Or 195, 220, 274 P2d 281 (1954).

[13] Id at 218.

[14] See Hofer v. Hofer, 244 Or 88, 93, 415 P2d 753 (1966), and cases cited therein. But see Caveny v. Asheim et al, 202 Or 195, 274 P2d 281 (1954).

■ Under this state of the record, we hold that the "credit" of $1,400, as allowed by the trial court, must be deleted from the decree, with the result that the balance due and payable under the contract is the sum of $6,350, as due on the date of the repossession of the cab on April 24, 1970.

■ Finally, it is contended that it was error for the trial court to allow $1,000 in punitive damages against defendant Marvin Davis. We have not previously decided whether an award of punitive damages is proper in a suit in equity.[⑮] Neither have we held directly that an award of punitive damages is always improper in an action for breach of contract.[⑯] We have held, however, that an award of punitive damages is not proper in the absence of proof that a plaintiff is entitled to an award of actual damages.[⑰] It follows that because, under the record in this case, plaintiff was not entitled to an award of damages for loss of income that decree must also be modified to delete the award of $1,000 in punitive damages.

This case is thus remanded for further proceedings in accordance with this opinion. Costs to neither party.

Modified and remanded.

McAllister, J., concurs in the result.

---

[⑮] See Annot., 48 ALR2d 947 (1956, Supps 1969 and 1971); Superior Const. Co. v. Elmo, 204 Md 1, 102 A2d 739, 104 A2d 581 (1954); and 16 Md L Rev 68 (1956).

[⑯] See Hodel, "The Doctrine of Exemplary Damages in Oregon," 44 Or L Rev 175, 196-197 (1965), citing Weaver v. Austin, 184 Or 586, 600, 200 P2d 593 (1948). But see Comment, 7 Will L J 137, 138, and 146-150 (1971), also citing Weaver v. Austin, id.

[⑰] Crouter v. United Adjusters, Inc., 92 Adv Sh 1304, 1318, 259 Or 348, 485 P2d 1208 (1971); Carnation Lbr. Co. v. McKenney et al, 224 Or 541, 546-47, 356 P2d 939 (1960).

O'CONNELL, C. J., dissenting.

As the majority opinion points out, there is evidence "that during the four months prior to the repossession he [plaintiff] earned $40 per shift 'gross' and $25 per shift 'net' from the operation of the cab over a period of four months and that he worked five or six shifts per week."

In spite of this proof of damages, plaintiff is denied any recovery whatsoever on the ground, among others, that "a respondent who has not cross-appealed cannot ordinarily obtain the modification of a decree in a manner favorable to himself." If we accept plaintiff's calculation of his loss, his total damages resulting from defendant's conduct would far exceed the amount allowed by the trial court which was the sum of the monthly payments plaintiff would have made had he been permitted to operate the taxi. If we allowed plaintiff full recovery we would, of course, be modifying the decree in his favor by giving him more than he would have received under the trial court decree. But plaintiff is not seeking full recovery on this appeal and, consequently, if we affirm the decree we would merely leave him in the same position as he was upon the entry of the decree in the trial court.

I recognize that the trial judge did not expressly equate the credit he allowed on the contract to the loss of profits suffered by plaintiff. But even though he did not, or even assuming that his reasoning in allowing the credit was erroneous, it should not preclude this court, sitting in equity, from treating the credit as an award representing a part of plaintiff's loss of profits.

I think that plaintiff was entitled to the specific

performance which the trial court allowed, and that the decree, at least in this respect, should be affirmed. I do not think that punitive damages should have been awarded.