Argued and submitted September 5, 1984, affirmed February 20, reconsideration denied April 23, 1985

KLINICKI,
*Petitioner on review,*

*v.*

KIM S. LUNDGREN, BERLININAIR, INC. et al,
*Respondents on review.*

KLINICKI,
*Respondent on review,*

*v.*

KIM S. LUNDGREN, BERLINAIR, INC.,
*Cross-Respondents,*

*and*

AIR BERLIN CHARTER COMPANY,
*Petitioner on review.*

(CC A7810-16086; CA A20084; SC S30590, S30611)

695 P2d 906

Brad Littlefield, of Goldsmith, Siegel, Engel & Littlefield, Portland, and Lloyd B. Egenes, of O'Gara, Friedman, Egenes & Burke, San Francisco, California, argued the cause and filed a petition and response for petitioner on review/respondent on review F. R. Klinicki.

Janet A. Metcalf, of English & Metcalf, Portland, argued the cause and filed a petition and response for petitioner on review/respondent on review Air Berlin Charter Company.

JONES, J.

## JONES, J.

The factual and legal background of this complicated litigation was succinctly set forth by Chief Judge Joseph in the Court of Appeals opinion as follows:

"In January, 1977, plaintiff Klinicki conceived the idea of engaging in the air transportation business in Berlin, West Germany. He discussed the idea with his friend, defendant Lundgren. At that time, both men were furloughed Pan American pilots stationed in West Germany. They decided to enter the air transportation business, planning to begin operations with an air taxi service and later to expand into other service, such as regularly scheduled flights or charter flights. In April, 1977, they incorporated Berlinair, Inc., as a closely held Oregon corporation. Plaintiff was a vice-president and a director. Lundgren was the corporation's president and a director. Each man owned 33 percent of the company stock. Lelco, Inc., a corporation owned by Lundgren and members of his family, owned 33 percent of the stock. The corporation's attorney owned the remaining one percent of the stock. Berlinair obtained the necessary governmental licenses, purchased an aircraft and in November, 1977, began passenger service.

"As president, Lundgren was responsible, in part, for developing and promoting Berlinair's transportation business. Plaintiff was in charge of operations and maintenance. In November, 1977, plaintiff and Lundgren, as representatives of Berlinair, met with representatives of the Berliner Flug Ring (BFR), a consortium of Berlin travel agents that contracts for charter flights to take sallow German tourists to sunnier climes. The BFR contract was considered a lucrative business opportunity by those familiar with the air transportation business, and plaintiff and defendant had contemplated pursuing the contract when they formed Berlinair. After the initial meeting, all subsequent contacts with BFR were made by Lundgren or other Berlinair employes acting under his directions.

"During the early stages of negotiations, Lundgren believed that Berlinair could not obtain the contract because BFR was then satisfied with its carrier. In early June, 1978, however, Lundgren learned that there was a good chance that the BFR contract might be available. He informed a BFR representative that he would make a proposal on behalf of a new company. On July 7, 1978, he incorporated Air Berlin Charter Company (ABC) and was its sole owner. On August

20, 1978, ABC presented BFR with a contract proposal, and after a series of discussions it was awarded the contract on September 1, 1978. Lundgren effectively concealed from plaintiff his negotiations with BFR and his diversion of the BFR contract to ABC, even though he used Berlinair working time, staff, money and facilities.

"Plaintiff, as a minority stockholder in Berlinair, brought a derivative action against ABC for usurping a corporate opportunity of Berlinair. He also brought an individual claim against Lundgren for compensatory and punitive damages based on breach of fiduciary duty.[1]

"The trial court found that ABC, acting through Lundgren, had wrongfully diverted the BFR contract, which was a corporate opportunity of Berlinair. The court imposed a constructive trust on ABC in favor of Berlinair, ordered an accounting by ABC and enjoined ABC from transferring its assets. The trial court also found that Lundgren, as an officer and director of Berlinair, had breached his fiduciary duties of good faith, fair dealing and full disclosure owed to plaintiff individually and to Berlinair. The court did not award plaintiff any actual damages on the breach of fiduciary duty claim.

---

[1]The named plaintiff in the complaint is F. R. Klinicki. The named defendants are Kim Lundgren, Berlinair, Inc., an Oregon corporation, and Air Berlin Charter Company, an Oregon corporation. The complaint set forth four causes of suit summarized as follows:

(A) The first cause of suit was brought by plaintiff as a derivative stockholders suit in his own behalf and on behalf of all other stockholders of Berlinair, Inc. "and in the right of Berlinair, Inc. and for its benefit" seeking a constructive trust against Lundgren and ABC jointly and severally, an accounting by all defendants and an injunction and attorney fees.

(B) The second cause of suit involves a personal claim by Klinicki requesting the court to require Lundgren to purchase the stock of plaintiff in Berlinair after the BFR corporate opportunity held by ABC is restored to Berlinair, Inc.

(C) The third cause of suit - Count I - is an individual claim of Klinicki for an accounting from Lundgren and ABC.

(D) The third cause of suit - Count II - is plaintiff's individual claim for unjust enrichment against Lundgren.

(E) The third cause of suit - Count III - is a personal claim by plaintiff against Lundgren for breach of implied covenant of good faith and fair dealing to plaintiff. For the third cause of suit plaintiff sought a constructive trust and accounting decree against Lundgren and ABC covering any "monies, funds, assets, facilities and properties received and acquired as a result of Lundgren's breach of fiduciary duty."

(F) The fourth cause of action is an individual suit by Klinicki solely against Lundgren for breach of fiduciary duty seeking general damages of $50,000 and $1 million in punitive damages.

All the issues were tried to the court, except that a jury was empaneled to try the punitive damages issue. It returned a verdict in favor of plaintiff and assessed punitive damages against Lundgren in the amount of $750,000. Lundgren then moved to dismiss plaintiff's claim for punitive damages. The court granted the motion to dismiss and, *sua sponte,* entered judgment in favor of Lundgren notwithstanding the verdict on the punitive damages claim." *Klinicki v. Lundgren,* 67 Or App 160, 162-63, 678 P2d 1250, 1251-52 (1984) (footnote omitted).

ABC appealed to the Court of Appeals contending that it did not usurp a corporate opportunity of Berlinair. Plaintiff cross-appealed from the trial court's dismissal of the punitive damages claim and from the entry of judgment in favor of Lundgren nothwithstanding the verdict on that issue. The Court of Appeals affirmed the trial court on all issues.

## I.  THE APPEAL BY AIR BERLIN CHARTER CO. (ABC)

ABC petitions for review to this court contending that the concealment and diversion of the BFR contract was not a usurpation of a corporate opportunity, because Berlinair did not have the financial ability to undertake that contract. ABC argues that proof of financial ability is a necessary part of a corporate opportunity case and that plaintiff had the burden of proof on that issue and did not carry that burden.

■  There is no dispute that the corporate opportunity doctrine precludes corporate fiduciaries from diverting to themselves business opportunities in which the corporation has an expectancy, property interest or right, or which in fairness should otherwise belong to the corporation. *See* Henn & Alexander, Laws of Corporations 632-37, § 237 (3rd ed 1983). The doctrine follows from a corporate fiduciary's duty of undivided loyalty to the corporation.[2] ABC agrees that,

---

[2]

" "* * * [Officers and directors] must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders [citations omitted]. In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the

unless Berlinair's financial inability to undertake the contract makes a difference, the BFR contract was a corporate opportunity of Berlinair.[3]

We first address the issue, resolved by the Court of Appeals in Berlinair's favor, of the relevance of a corporation's financial ability to undertake a business opportunity to proving a diversion of corporate opportunity claim. This is an issue of first impression in Oregon.

The Court of Appeals held that a corporation's financial ability to undertake a business opportunity is not a factor in determining the existence of a corporate opportunity unless the defendant demonstrates that the corporation is technically or de facto insolvent. Without defining these terms, the Court of Appeals specifically placed the burden of proof[4]

---

benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; the test of his liability is whether he has unjustly gained enrichment. Bailey v. Jacobs, 325 Pa. 187, 194, 189 A. 320, 324.' * * * see generally Fletcher, Cyclopedia Corporations §861.1 (rev. ed. 1965); * * * Note, 'Corporate Opportunity,' 74 Harv. L. Rev. 765 (1961)." *Seaboard Industries, Inc. v. Monaco*, 442 Pa 256, 261-62, 276 A2d 305, 309 (1971).

The Corporate Directors' Guidebook (pp 1599-1600) defines the duty of loyalty:

"I. Duty of Loyalty. By assuming his office, the corporate director commits allegiance to the enterprise and acknowledges that the best interests of the corporation and its shareholders must prevail over any individual interest of his own. The basic principle to be observed is that the director should not use his corporate position to make a personal profit or gain to his personal advantage. * * *"

This definition reflects the fiduciary duties which generally attach to directors of close corporations. *See, e.g., Delaney v. Georgia-Pacific Corp.*, 278 Or 305, 564 P2d 277 (1977); *Baker v. Commercial Body Builders*, 264 Or 614, 507 P2d 387 (1973).

[3] ABC asserts in its brief that the single issue in the corporate opportunity portion of this appeal is the financial ability of Berlinair to undertake the BFR contract. It makes no point of the fact that the trial court found Kim Lundgren usurped the corporate opportunity for himself, yet ABC was controlled and owned by Kim Lundgren, his father, Leonard Lundgren, and their attorney.

[4] This case was tried before the effective date of the Oregon Evidence Code. The code now provides:

"OEC 305. Allocation of the burden of persuasion. A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting."

"OEC 307. Allocation of the burden or producing evidence. (1) The burden or producing evidence as to a particular issue is on the party against whom a finding on the issue would be required in the absence of further evidence.

"(2) The burden of producing evidence as to a particular issue is initially on the party with the burden of persuasion as to that issue."

as to this issue on the fiduciary by saying: "To avoid liability for usurping a corporate opportunity on the basis that the corporation was insolvent, the fiduciary must prove insolvency." 67 Or App at 165, 678 P2d at 1254. The Court of Appeals then concluded "that ABC usurped a corporate opportunity belonging to Berlinair when, acting through Lundgren, the BFR contract was diverted" because nothing in Lundgren's testimony or otherwise in the record suggested that Berlinair was insolvent or was no longer a viable corporate entity. 67 Or App at 166, 678 P2d at 1254. Accordingly, the Court of Appeals held that the constructive trust, injunction, duty to account and other relief granted by the trial court against ABC were appropriate remedies.

One commentator, Daniel Walker, in *Legal Handles Used to Open or Close the Corporate Opportunity Door,* 56 NW U L Rev 608 (1961), wrote that few areas of the law are as plagued with platitudes as the fiduciary responsibility of corporate officers and directors. He noted that the Supreme Court of the United States, seemingly caught up in its enthusiasm for such platitudes, strings together a whole series of them quoting from *Pepper v. Litton,* 308 US 295, 311, 60 S Ct 238, 247, 84 L Ed 281, 291-92 (1939):

> " 'He who is in such a fiduciary position cannot serve himself first and his *cestuis* second.... He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters * * *. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders.... [His power] may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis.*' " Walker, 56 NW U L Rev at 608 n 1.

Walker then commented:

> "One aspect of corporate fiduciary responsibility that has particularly troubled the courts in their search for a rule of thumb is that relating to so-called corporate opportunities. *What are the legal rules to be applied in determining when a corporate official, given an opportunity to make a profitable acquisition (business, lease, land, stock, whatever), can take it for himself rather than turning it over to the corporation?*
> * * *

"The answer given by many courts may start with a bow to the fiduciary concept (*e.g.,* 'Of course, those having fiduciary duty must never place themselves in a situation of divided loyalties'), but it frequently ends up with an amorphous test which may help the court state the result but rarely helps anyone find the result: 'The officer is free to take an opportunity providing the corporation does not have an interest or expectancy [whatever that is] in the opportunity.' It is just as helpful, and as unhelpful, to say as some courts do that if the opportunity 'belongs' to the corporation or if the officer is under a 'duty' to negotiate the opportunity for the corporation, the official cannot have it. The problem is, when does it 'belong' to the corporation and under what circumstances does the 'duty' arise? * * *" 56 NW U L Rev at 608-09 (emphasis added; brackets in original; footnote omitted).

Before proceeding further our initial task must be to define what is meant by "corporate opportunity," and to determine when, if ever, a corporate fiduciary may take personal advantage of such an opportunity. Our resolution of this case will be limited to announcing a rule to be applied when allegations of usurpation of a corporate opportunity are made against a director of a close corporation. The determination of a rule to apply to similar situations arising between a director and a publicly held corporation presents problems and concepts which may not necessarily require us to apply an identical rule in that similar but distinguishable context.

As we mentioned at the outset, this issue is a matter of first impression in this state. While courts universally stress the high standard of fiduciary duty owed by directors and officers to their corporation, there are distinct schools of thought on the circumstances in which business opportunities may be taken for personal advantage. One group of jurisdictions severely restricts the corporate official's freedom to take advantage of opportunities by saying that the ability to undertake the opportunity is irrelevant and usurpation is essentially prohibited; other jurisdictions use a test which gives relatively wide latitude to the corporate official on the theory that financial ability to undertake a corporate opportunity is a prerequisite to the existence of a corporate opportunity.

A rigid rule was applied in *Irving Trust Co. v. Deutsch,* 73 F2d 121 (2nd Cir 1934). In that case a syndicate made

of up directors of Acoustic Products Co. purchased for themselves from another corporation the rights to manufacture under certain radio patents which were concededly essential to Acoustic. They justified this on the ground that Acoustic was not financially able to purchase the patents on which the defendants later made very substantial profits. The court refused to inquire whether the conclusion of financial inability was justified. Referring to the facts which raised a question whether Acoustic actually did lack the funds or credit necessary to make the acquisition, the court said:

"* * * Nevertheless, they [the facts in the case concerning whether Acoustic lacked funds to carry out the contract] tend to show the wisdom of a rigid rule forbidding directors of a solvent corporation to take over for their own profit a corporate contract on the plea of the corporation's financial inability to perform. If the directors are uncertain whether the corporation can make the necessary outlays, they need not embark it upon the venture; if they do, they may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pockets. * * *" 73 F2d at 124.

An oft-cited Harvard Law Review note discussed executive appropriation of corporate opportunities and the *Irving Trust* case as follows:

"Where an opportunity is within the corporation's line of business, the executive seems normally required to offer it for consideration by the board of directors and to await rejection — should it be forthcoming — before seizing it himself. There are, however, some exceptions to this disclosure requirement, all of which rest immediately on the proposition that the circumstances clearly evidence corporate inability * * * to seize the opportunity * * *. [An] exception to the requirement of tender arises where the corporation is insolvent and nearly defunct. [Jasper v. Appalachian Gas Co., 152 Ky. 68, 153 S.W. 50 (1913).] The problem with this exception is the difficulty of its extension to cases where the corporation is in serious financial difficulty or lacks liquid assets but may still be a going concern. [In Hannerty v. Standard Theatre Co., 109 Mo. 297, 19 S.W. 82 (1891), a finding of absence of corporate opportunity was based on the financial inability of the corporation. *But see* Irving Trust Co.v. Deutsch, 73 F.2d 121 (2d Cir. 1934), and Electronic Dev. Co. v. Robson, 148 Neb. 526, 28 N.W.2d 130 (1947), where mere financial inability was held inadequate to exonerate an executive who appropriated an

opportunity.] In neither case will it ordinarily be entirely clear that, given knowledge of the opportunity, the corporation will be unable to secure needed financing with reasonable rapidity. The very existence of a prospective profitmaking venture may generate additional financial backing and may convince creditors to be less importunate in their demands. Every major executive, including the one who has discovered the opportunity, would seem obligated to make a genuine effort to enable the corporation to secure the anticipated profit. * * *

"Fearing that anything less than a prophylactic rule would discourage executives from expending their full efforts to obtain financing for the corporation, at least one court has articulated the rule that the executive is precluded from appropriating the opportunity where the corporation is allegedly unable to obtain the required funds. [Citing Irving Trust Co. v. Deutsch, supra.] * * *" Note, *Corporate Opportunity,* 74 (Vol I) Harv L Rev 765, 772-73 (1961) (brackets contain text of footnotes; other footnotes omitted).

In 1962, Professor Victor Brudney wrote in the Michigan Law Review:

"* * * [A] question of corporate opportunity * * * may be analogized to the situation in which the corporation is apparently unable to exploit a potential opportunity because of lack of funds, because of some legal obstacle, or because the person offering the opportunity is purportedly unwilling to deal with it, and the insider takes advantage of the corporate opportunity for his own benefit. Despite frequent pious platitudes to the contrary, neither legislatures nor courts have seen fit to deprive the insider in all, or indeed in most, such circumstances of the temptation to choose between his interest and the interest of the recognized beneficiaries by prescribing a universal rule denying him the fruits of such extraneous activities when they have not demonstrably harmed the corporation or its other security holders.[5] * * *" Brudney,

---

[5] "See Carrington & McElroy, *The Doctrine of Corporate Opportunity,* 14 Bus. Law. 957 (1959); Fuller, *Restrictions Imposed by Directorship Status on Personal Business Activities of Directors,* 26 Wash. L. Rev. 189 (1941); Ramsey, *Directors Power to Compete with His Corporation,* 18 Ind. L.J. 293 (1943); Walker, *Legal Handles Used to Open or Close the Corporate Opportunity Door,* 56 NW. U.L. Rev. 608 (1961); Comment, 31 Calif. L. Rev. 188 (1943); Note, 39 Colum. L Rev. 219 (1939); Note, *Corporate Opportunity,* 74 Harv. L. Rev. 765 (1961); Note, 54 Harv. L. Rev. 1191 (1941); Note, *Statutory Sanctions for Conduct of Corporate Directors,* 26 Iowa L. Rev. 334 (1941); Note, 84 U. Pa. L. Rev. 1008 (1936); Note, 2 U. Chi. L. Rev. 323 (1935); Note, 44 Yale L.J. 527 (1935)."

*Insider Securities Dealings During Corporate Crises,* 61 (Vol I) Mich L Rev 1, 25 (1962).

He then noted the *Irving Trust* case, saying with apparent approval:

> "* * * However, from time to time a court will require an insider to account for his profits even in the absence of a showing of harm, on the theory that although the corporation might be unable itself to exploit a particular opportunity, the insider should be denied the right to exploit it and the concomitant temptation to inhibit the corporation from making every effort to do so." 61 Mich L Rev at 25-26 (footnotes omitted).

Representing a more relaxed view of a corporate official's responsibility, in *Guth v. Loft, Inc.,* 23 Del Ch 255, 272-73, 5 A2d 503, 511 (1939), the Supreme Court of Delaware said:

> "* * * [I]f there is presented to a corporate officer or director a business opportunity *which the corporation is financially able to undertake,* is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. * * *" (Emphasis added.)

The language in *Guth* implies that financial ability to undertake a corporate opportunity is not only relevant, but perhaps a condition precedent to the existence of a corporate opportunity. But the language in *Guth* was dictum because that famous case, involving the creation of the Pepsi-Cola enterprise, did not involve the issue of financial ability to undertake the opportunity. The court may have thought that a lack of funds short of insolvency was relevant because it discussed Guth's defense in this area, finding that "Loft's net asset position at that time was amply sufficient to finance the enterprise."[6] But other language in *Guth* raises the question

---

[6] In *Guth v. Loft, Inc.,* 23 Del Ch 255, 270, 5 A2d 503, 510 (1939), the court held that determination of the issue of breach of duty should be made from a consideration of all the circumstances of the transactions, noting the accepted rule that corporate officers and directors are not permitted to use their position of trust and confidence to

whether the terms "ability to undertake" and "ability to take advantage of" have broader concerns than mere financial capacity or incapacity:

"* * * Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has *fundamental knowledge, practical experience and ability to pursue, which, logically and naturally is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion,* it may be properly said that the opportunity is in the line of the corporation's business." 23 Del Ch at 279, 5 A2d at 514 (emphasis added).

On the other end of the legal spectrum from *Irving Trust Co. v. Deutsch, supra,* are two Minnesota cases: *Miller v. Miller,* 301 Minn 207, 222 NW2d 71, 77 ALR3d 941 (1974), and *A.C. Petters v. St. Cloud Enterprises, Inc.,* 301 Minn 261, 222 NW2d 83 (1974). In *Miller,* the Minnesota Supreme Court stated a two-step test to be applied in corporate opportunity cases. The first step, the "line of business" part of the test, was described as follows:

"* * * The threshold question to be answered is whether a business opportunity presented is also a 'corporate' opportunity, i.e., whether the business opportunity is of sufficient importance and is so closely related to the existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation. This question, necessarily one of fact, can best be resolved, we believe, by resort to a flexible application of the 'line of business' test set forth in *Guth v. Loft, Inc., supra.* The inquiry of the factfinder should be

---

further their private interests:

"* * * The standard of loyalty is measured by no fixed scale.

"If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty. [Citations omitted.]"

directed to all facts and circumstances relevant to the question, the most significant being: Whether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right; the relationship of the opportunity to the corporation's business purposes and current activities - whether essential, necessary, or merely desirable to its reasonable needs and aspirations -; whether within or without its corporate powers, the opportunity embraces areas adaptable to its business and into which the corporation might easily, naturally, or logically expand; the competitive nature of the opportunity - whether prospectively harmful or unfair -; *whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity;* and whether the opportunity includes activities as to which the corporation has a fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue. The fact that the opportunity is not within the scope of the corporation's powers, while a factor to be considered, should not be determinative, especially where the corporate fiduciary dominates the board of directors or is the majority shareholder." 301 Minn at 224-25, 222 NW2d at 81 (emphasis added).

In other words, the court found that financial ability is a prerequisite to establishing a corporate opportunity. The court went on to hold that, where the facts were in dispute, the burden of proof on the financial issue rests upon the "party attacking the acquisition":

"If the facts are undisputed that the business opportunity presented bears no logical or reasonable relation to the existing or prospective business activities of the corporation *or that it lacks either the financial or fundamental practical or technical ability to pursue it,* then such opportunity would have to be found to be noncorporate as a matter of law. If the facts are disputed or reasonable minds functioning judicially could disagree as to whether the opportunity is closely associated with the existing or prospective activities of the corporation or its financial or technical ability to pursue it, *the question is one of fact with the burden of proof resting upon the party attacking the acquisition.*" 301 Minn at 225, 222 NW2d at 81 (emphasis added).

The companion case of *A.C. Petters v. St. Cloud Enterprises, Inc., supra,* applied the rule of *Miller v. Miller, supra. See also Ellzey v. Fyr-Pruf, Inc.* 376 So2d 1328 (Miss 1979).

■    Counsel for defendant, relying on *Miller,* contends there is no corporate opportunity if there is no capacity to take advantage of the corporate opportunity. We reject this argument. By the same token, we reject plaintiff's contention, relying on *Irving Trust,* that financial ability is totally irrelevant in an unlawful taking of a corporate opportunity.

In this opinion we previously quoted from an article written by Professor Victor Brudney in 1962 when he was advocating a strict view on usurpation of corporate opportunities in closely held corporations, Brudney, *Insider Securities Dealings During Corporate Crises, supra.* Almost 20 years later, this same noted authority on Corporation Law joined by Professor Robert Charles Clark wrote in the Harvard Law Review that the law of corporate opportunities is still among the least satisfactory limbs of doctrine in the corpus of corporate law. After criticizing the Minnesota court's approach in *Miller* as adding "only a new layer of confusion to an already murkey area of law, without forwarding the analysis in any significant fashion, the authors assert that "[n]ot only are the common formulations vague, but the courts have articulated no theory that could serve as a blueprint for constructing meaningful rules." Brudney and Clark, *A New Look at Corporate Opportunities,* 94 Harv L Rev 997, 998 (1981). In that article, Professors Brudney and Clark argue that a principled doctrine should distinguish between publicly held corporations and close corporations. They suggest that in the former case a categorical ban on diversions is usually appropriate, but that separate rules should be developed for full-time executives, outside directors and parent companies. They assert, however, that in cases involving close corporations, a more flexible, selective approach should govern in light of the essentially contractual nature of the close corporate venture. They reason:

"* * * Investors in public corporations are usually passive and widely scattered contributors of money to be managed by pre-selected officers to whom they effectively delegate full decisionmaking power over operating matters. In contrast, investors in private ventures are fairly small in number and tend to know one another. They make more conscious choices when selecting managers from among themselves. They are likely to be active participants rather than merely passive contributors of funds. And they can consent in a more

meaningful way to diversions of corporate assets by fellow participants, either when they form or join enterprises, or on the occasion of the diversion. Accordingly, such investors have less need of categorical strictures on such diversions." 94 Harv L Rev at 1003 (footnotes omitted).

The authors then suggest guidelines for the taking of business opportunities by participants in closely held corporations:

"(1)   If the disputed opportunity is functionally related to the corporation's business, then, whether or not it is 'necessary' or of 'special value,' individual participants may not take it.

"(2)   If the corporation has an 'interest' or 'expectancy' in the opportunity, individual participants may not take it.

"(3)   If the participants consent in advance or contemporaneously to diversion of the new project, an individual participant may take it, even though the taking would otherwise run afoul of (1) or (2); provided, however, that nothing less than express contemporaneous consent will permit the taking of functionally related opportunities whose acceptance is 'necessary' to prevent loss or injury to the corporation." 94 Harv L Rev at 1011 (footnote omitted).

They conclude that the burden should be on the diverter to prove that the particular diversion was originally consented to by the venturers.

Brudney and Clark then address the specific issue in this case—the relevance of corporate incapacity to undertake a corporate opportunity to usurpation of a corporate opportunity by a fiduciary:

"Our proposed principles * * * leave no room for some of the other variables that frequently appear in the opinions. There is a substantial body of case law that permits officers to divert corporate opportunities when some showing is made that the corporation is unable to take the opportunity because of limitations in its charter or contracts, external legal constraints, *its inability to finance the acquisition,*[7] or the

---

[7]   "City of Miami Beach v. Smith, 551 F.2d 1370 (5th Cir. 1977); Presidio Mining Co. v. Overton, 261 F. 933 (9th Cir. 1919), *aff'd,* 270 F. 388 (9th Cir.), *cert. denied,* 256 U.S. 694 (1921); Rankin v. Frebank Co., 47 Cal. App. 3d 75, 121 Cal. Rptr. 348 (1975); Katz Corp. v. T.H. Canty & Co., 168 Conn. 201, 362 A.2d 975 (1975); A.C. Petters Co. v. St. Cloud Enterprises, Inc., 301 Minn. 261, 222 N.W.2d 83 (1974) (per curiam); Gauger v. Hintz, 262 Wis. 333, 55 N.W.2d 426 (1952)."

unwillingness of the persons offering the opportunity to deal with the corporation.

> "As courts have pointed out on several occasions, if financial disabilities or third-party refusals to deal with the corporation are accepted as tests, the inevitable result will be to permit the diversion. This is true because courts must resolve the legal issues on the basis of a set of facts largely within the control of the diverter. *Thus, for example, when managers argue that the corporation could not have financed an offered bargain, the capacity of outsiders to show that the corporation could have raised the money is limited.* * * *" 94 Harv L Rev at 1020-21 (footnotes omitted).

The authors conclude:

> "There is no reason to allow the diverters to exploit opportunities that they claim the corporation is unable to exploit, if the claimed inability may be feasibly eliminated. To permit claims of disability to become the subject of judicial controversy when they can only be disproven by outsiders with great difficulty and at considerable expense is to tempt participants to actions whose impropriety is visible but rarely subject to effective challenge. Availability of the defense of corporate incapacity reduces the incentive to solve corporate financing and other problems.

> "The argument against the defense of incapacity or disability may be less forceful for close corporations than for public corporations because of the greater familiarity of the participants with the affairs of the firm, their better access to relevant information, and the relative manageability of the problems. But the arguments against the defense are not without power in the close corporation context as well, as several courts have noted. Moreover, *the possibility of obtaining consent to non-pro rata participation in a venture that the corporation appears unable to exploit should remove the seeming harshness of a rule that does not allow the defense of corporate incapacity.* Indeed, rejection by the other participants of a request to assist in curing the incapacity might occur in circumstances that imply consent to the requesting person's taking the opportunity." 94 Harv L Rev at 1022 (emphasis added).

On April 13, 1984, the American Law Institute published its "Tentative Draft No. 3" concerning "Principles of Corporate Governance: Analysis and Recommendations." The draft, of course, does not represent the position of the ALI, but it does contain definitions and rules which we find

helpful in resolving the main issue in this case. Section 5.12 of the draft, which contains the proposed general rule and definition, reads as follows:

"(a) *General Rule:*

"A director or principal senior executive may not take a corporate opportunity for himself or an associate unless:

"(1)  The corporate opportunity has first been offered to the corporation, and disclosure has been made to the corporate decisionmaker of all material facts known to the director or principal senior executive concerning his conflict of interest and the corporate opportunity (unless the corporate decisionmaker is otherwise aware of such material facts); and

"(2)  The corporate opportunity has been rejected by the corporation in a manner that meets one of the following standards:

"(A)  In the case of a rejection of a corporate opportunity that was authorized by disinterested directors following such disclosure, the directors who authorized the rejection acted in a manner that meets the standards of the business judgment rule set forth in § 4.01(d);[8]

"(B)  In the case of a rejection that was authorized or ratified by disinterested shareholders following such disclosure, the rejection was not equivalent to a waste of corporate assets; and

"(C)  In the case of a rejection that was not authorized or ratified in the manner contemplated in § 5.12(a)(2)(A) or (B) or permitted by the terms of a [validly adopted] standard of the corporation * * *, the taking of the opportunity was fair to the corporation.

"(b) *Definition of a Corporate Opportunity:*

"A corporate opportunity means any opportunity to engage in a business activity (including acquisition or use of

---

[8]Section 4.01 provides in pertinent part:

"A director has a duty to his corporation to perform his functions in good faith, in a manner that he reasonably believes to be in the best interests of the corporation * * * and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like profession and under similar circumstances."

*See, Devlin v. Moore,* 64 Or 433, 462, 130 P 35, 45 (1913).

any contract right or other tangible or intangible property) that:

"(1)  In the case of a principal senior executive or any director, is an opportunity that is communicated or otherwise made available to him either:

"(A)  in connection with the performance of his obligations as a principal senior executive or director or under circumstances that should reasonably lead him to believe that the person offering the opportunity expects him to offer it to the corporation, or

"(B)  through the use of corporate information or property, if the resulting opportunity is one that the principal senior executive or director should reasonably be expected to believe would be of interest to the corporation; or

"(2)  In the case of a principal senior executive or a director who is a full-time employee of the corporation, is an opportunity that he knows or reasonably should know is closely related to the business in which the corporation is engaged or may reasonably be expected to engage." (Bracketed section references omitted.)

Section 5.12 presents an approach very similar to that suggested by Chief Judge Joseph in the Court of Appeals decision rendered in this case. Section 5.12 generally would require an opportunity that could be advantageous to the corporation to be offered to the corporation by a director or principal senior executive before he takes it for himself. Section 5.12 declines to adopt the rigid rule expressed in *Irving Trust Co. v. Deutsch, supra,* which precludes a person subject to the duty of loyalty from pursuing a rejected opportunity. The proposed rule permits a director or principal senior executive to deal with his corporation so long as he deals fairly with full disclosure and bears the burden of proving fairness unless the corporate opportunity was rejected by disinterested directors or shareholders.

The comment to Section 5.12(a) reads:

"Section 5.12(a) sets forth the general rule requiring a director or principal senior executive to first offer an opportunity to the corporation before taking it for himself. If the opportunity is not offered to the corporation, the director or principal senior executive will have violated § 5.12(a).

"Section 5.12(a) contemplates that a corporate opportunity will be promptly offered to the corporation, and that the corporation will promptly accept or reject the opportunity. Failure to accept the opportunity promptly will be considered tantamount to a rejection. * * *"

and that

"* * * Rejection in the context of § 5.12(a)(2) may be based on one or more of a number of factors, such as lack of interest of the corporation in the opportunity, *its financial inability to acquire the opportunity,* legal restrictions on its ability to accept the opportunity, or unwillingness of a third party to deal with the corporation. * * *" (Emphasis added.)

The comment to Section 5.12(b) reads:

"Section 5.12(b) defines a corporate opportunity broadly as including any proposed acquisition of contract rights or other tangible or intangible property which falls into one of the categories set forth in §§ 5.12(b)(1) or 5.12(b)(2). * * *"

Section 5.12(c) would allocate the burden of proof in corporate opportunity cases as follows:

"(c)   *Burden of Proof:*

"In any proceeding in which there is a challenge under § 5.12(a), the challenging party has the burden of proof, except if the rejection of a corporate opportunity was not authorized or ratified in the manner contemplated in § 5.12(a)(2)(A) or (B) or permitted by the terms of a [validly adopted] standard of the corporation * * *, the director or principal senior executive has the burden of proving that his taking of the opportunity was fair to the corporation. If a good faith attempt has been made to achieve the disclosure contemplated by § 5.12(a)(1) in connection with rejection of a corporate opportunity, the burden of proof remains on the challenging party even if the disclosure failed to so comply, so long as the rejection is ratified by disinterested directors or shareholders after complete disclosure has been made. *If the challenging party satisfies the burden of proving that a corporate opportunity was taken without being offered to the corporation, the challenging party will prevail.*" (Emphasis added.)

The comment to Section 5.12(c) reads in part:

"The burden of coming forward with evidence and the ultimate burden of proof will be upon the person attacking a director's or principal senior executive's conduct to prove that (1) the director of principal senior executive acquired a

corporate opportunity * * *. The complainant will also have the burden of proof with respect to all other aspects of the transaction, including lack of disclosure to the corporate decisionmaker and establishing that the requisite number of directors or shareholders who approved or ratified the transaction were not disinterested. *However, if disinterested directors or shareholders have not approved or ratified the rejection of the opportunity, the director or principal senior executive will have the burden of proving that his taking of the opportunity was fair and that the rejection of the opportunity was fair to the corporation at the time of the rejection.* * * *" (Emphasis added.)

Whether the rejection was fair or not includes consideration of whether the corporation was financially or otherwise incapacitated from undertaking the corporate opportunity. We agree with the proposed ALI Principles of Corporate Governance, *supra,* as to the following rules for application in close corporation corporate opportunity cases.[9]

Where a director or principal senior executive of a close corporation wishes to take personal advantage of a "corporate opportunity," as defined by the proposed rule, the director or principal senior executive must comply strictly with the following procedure:

(1)  the director or principal senior executive must promptly offer the opportunity and disclose all material facts known regarding the opportunity to the disinterested directors[10] or, if there is no disinterested director, to the disin-

---

[9] We have approved other ALI Tentative Drafts. *See, Troutman v. Erlandson,* 287 Or 187, 598 P2d 1211 (1979).

[10] The term "disinterested director" is not specifically defined in the tentative proposal for ALI's "Principles of Corporate Governance and Structure" (1984). Instead, an "interested director" is defined in Section 1.15(1) of the ALI's Principles of Corporate Governance and Structure (Tent. Draft No. 2 1984):

"(1)  a director or officer is 'interested' in a transaction if:

"(a)  the director or officer is a party to the transaction, or

"(b)  the director or officer or an associate of the director or officer has a pecuniary interest in the transaction, or the director or officer has a financial or familial relationship to a party to the transaction, that is sufficiently substantial that it would reasonably be expected to affect the director's or officer's judgment with respect to the transaction in a manner adverse to the corporation." (Bracketed section references omitted.)

terested shareholders.[11] If the director or principal senior executive learns of other material facts after such disclosure, the director or principal senior executive must disclose these additional facts in a like manner before personally taking the opportunity.

    (2)   The director or principal senior executive may take advantage of the corporate opportunity only after full disclosure and only if the opportunity is rejected by a majority of the disinterested directors or, if there are no disinterested directors, by a majority of the disinterested shareholders.[12] If, after full disclosure, the disinterested directors or shareholders unreasonably fail to reject the offer,[13] the interested

---

Section 5.04 of Tentative Draft No. 3 provides:

> "A provision that gives a specified effect to action by disinterested directors requires the affirmative votes of a majority of the directors on the board or an appropriate committee who are not interested [§ 1.15] in the transaction in question."

Thus we define a "disinterested director" as any director other than one "interested" as defined by Section 1.15(1).

[11] The term "disinterested shareholder" is not specifically defined in the ALI tentative drafts. Section 1.09 reads:

> "[This definition will be written in connection with Part V. On what constitutes a majority of disinterested shareholders, see [§ 1.27(2)].]"

However, no definition of "disinterested shareholder" was written in Part V. Our definition of "disinterested shareholder" is derived from Section 1.15 of the ALI's Second Tentative Draft, *supra.* Subsection (2) of Section 1.15 provides:

> "A shareholder is interested in a transaction if either the shareholder or, to his knowledge, an associate of the shareholder, is a party to the transaction."

Section 5.05 of the Third Tentative Draft, *supra,* provides:

> "A provision that gives a specified effect to action by disinterested shareholders requires approval of the proposal by a majority of the votes cast by shareholders who are not interested [§ 1.15] in the transaction in question."

Thus, we define a "disinterested shareholder" as one who is not a party nor an associate of a party to the transaction in question.

[12] A simple majority of disinterested directors or shareholders is sufficient to authorize or ratify an appropriation of a corporate opportunity by a director or principal executive officer.

[13] A valid acceptance of the offer by the disinterested directors or shareholders would bar the fiduciary from appropriating the opportunity. An acceptance of the offer by the disinterested directors which failed to meet the standards of the business judgment rule, or an acceptance by the disinterested shareholders which was the equivalent of a waste of corporate assets would have the same effect as an unreasonable failure to reject. The corporate fiduciary could appropriate the opportunity only upon a showing that the taking was fair to the corporation. *See* ALI, Principles of Corporate Governance and Structure § 5.12(a)(2) (Tent. Draft No. 3 1984).

director or principal senior executive may proceed to take the opportunity if he can prove the taking was otherwise "fair" to the corporation. Full disclosure to the appropriate corporate body is, however, an absolute condition precedent to the validity of any forthcoming rejection as well as to the availability to the director or principal senior executive of the defense of fairness.

(3) An appropriation of a corporate opportunity may be ratified by rejection of the opportunity by a majority of disinterested directors or a majority of disinterested shareholders, after full disclosure subject to the same rules as set out above for prior offer, disclosure and rejection. Where a director or principal senior executive of a close corporation appropriates a corporate opportunity without first fully disclosing the opportunity and offering it to the corporation, absent ratification, that director or principal senior executive holds the opportunity in trust for the corporation.

■ Applying these rules to the facts in this case, we conclude:

(1) Lundgren, as director and principal executive officer of Berlinair, owed a fiduciary duty to Berlinair.

(2) The BFR contract was a "corporate opportunity" of Berlinair.

(3) Lundgren formed ABC for the purpose of usurping the opportunity presented to Berlinair by the BFR contract.

(4) Lundgren did not offer Berlinair the BFR contract.

(5) Lundgren did not attempt to obtain the consent of Berlinair to his taking of the BFR corporate opportunity.

(6) Lundgren did not fully disclose to Berlinair his intent to appropriate the opportunity for himself and ABC.

(7) Berlinair never rejected the opportunity presented by the BFR contract.

(8) Berlinair never ratified the appropriation of the BFR contract.

(9) Lundgren, acting for ABC, misappropriated the BFR contract.

Because of the above, the defendant may not now contend that Berlinair did not have the financial ability to successfully pursue the BFR contract. As stated in proposed Section 5.12(c) of the Principles of Corporate Governance, *supra,* "If the challenging party satisfies the burden of proving that a corporate opportunity was taken without being offered to the corporation, the challenging party will prevail."

This specific conclusion is also backed by what some might call a legal platitude and others might call a legal classic. When placing special burdens on those in positions of trust, it is worthwhile to recall the well-known admonition of Chief Justice Cardozo speaking for the New York Court of Appeals:

> "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions * * *. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." *Meinhard v. Salmon,* 249 NY 458, 463-64, 164 NE 545, 546 (1928).

## II. THE CROSS-APPEAL BY KLINICKI

We now turn to plaintiff's cross-appeal. In this case plaintiff brought equitable suits for a constructive trust, accounting and injunction against all defendants, and a personal claim against Lundgren. Plaintiff sought actual and punitive damages against Lundgren, but not against the other defendants. The court made no award of actual damages against Lundgren. The punitive damages issue was segregated and tried before a jury. The jury then returned a verdict for $750,000 punitive damages on February 19, 1979.

On May 6, 1980, some four months after the verdict of $750,000 punitive damages, the defendants moved under ORCP 21A to dismiss the fourth cause of action in its entirety

upon the ground that it failed to state facts constituting a claim. Defendants' main contention in that motion was that Klinicki was not entitled to general damages and therefore could not recover punitive damages.

On July 7, 1980, further proceedings took place in which the trial judge announced his ruling setting aside the punitive damages verdict as a matter of law.[14] The trial judge ruled that (1) a corporate opportunity existed, (2) the opportunity was in the line of business of Berlinair, (3) defendants had not borne the burden of proving Berlinair was financially unable to undertake the opportunity, and (4) defendant Lundgren breached his fiduciary duty.

The trial court struck the punitive damages relying on *Pedah Company v. Hunt,* 265 Or 433, 509 P2d 1197 (1973). In *Pedah,* this court held that a court of equity cannot award punitive damages incident to the granting of injunctive relief. However, in *Rexnord, Inc. v. Ferris,* 294 Or 392, 657 P2d 673 (1983), decided after the trial in this case, this court overruled *Pedah* and held that a court may award actual and punitive damages as well as equitable relief in a single action if the plaintiff pleads and proves a claim which factually would permit an award of actual and punitive damages. In *Rexnord* actual and punitive damages were sought and obtained in addition to equitable relief against the same defendants flowing from the same defendants' tortious conduct. In this case no actual damages were awarded, but punitive damages were awarded against Lundgren personally and certain equitable relief was granted against Lundgren and ABC. We point out that the accounting and injunction against transferring assets was directed against all defendants, but the constructive trust was only decreed against ABC and its officers, directors and their successors.

This case is similar to *Rexnord, Inc. v. Ferris, supra,*

---

[14] ORCP 63A. requires that a judgment nov be granted "on motion":

"* * * [T]he court may, *on motion,* render a judgment notwithstanding the verdict, or set aside any judgment which may have been entered and render another judgment, as the case may require." (Emphasis added.)

In this case Count IV of the complaint was stricken under a Rule 21A.(8) motion (insufficient facts to constitute a claim), therefore rendering an ORCP 63A motion moot.

in that both claims were based on tortious conduct. In *Rexnord*, the complaint claimed defendants engaged in unfair competition, converted plaintiff's trade secrets, confidential information, plans, etc., and interfered with plaintiff's contractual relations. In this case, Lundgren was charged with a course of conduct in secretly diverting the BFR contract to his own company, ABC, constituting a breach of fiduciary duty.

■ We recently restated that in this state an award of punitive damages coupled with an award of only nominal damages is proper when the case involves special circumstances such as a breach of a fiduciary duty by a public officer. *Lane County v. Wood*, 298 Or 191, 691 P2d 473 (1984). We said in *Lane County* that there is no logical connection between actual damages and punitive damages because actual damages are to compensate the injured party, whereas punitive damages are "to give bad actors a legal spanking." 298 Or at 203, 691 P2d at 479. Nevertheless we feel, absent breach of public trust or cases in which damages are presumed,[15] punitive damages claims cannot be awarded merely to punish; the plaintiff must also plead and prove he or she was somehow actually hurt and damaged by the defendant's conduct. In other words, a proven discrete, discernible harm must underlie any punitive damages award.

The question remains whether that proven harm may be manifested by a decree granting certain equitable remedies or whether actual damages must be awarded. In *Belleville v. Davis*, 262 Or 387, 405, 498 P2d 744, 752 (1972), the author of the opinion stated, "We have not previously decided whether an award of punitive damages is proper in an equity case." We have now resolved that issue in *Rexnord, Inc. v. Ferris, supra.* The author continued, "We have held, however, that an award of punitive damages is not proper in the absence of proof that plaintiff is entitled to an award of actual damages." 262 Or at 405, 498 P2d at 752. Citing *Crouter v. United Adjusters, Inc.*, 259 Or 348, 364, 485 P2d 1208 (1971), and *Carnation Lbr. Co. v. McKenney*, 224 Or 541, 546-47, 356 P2d 932 (1960), the court then concluded that under the record in *Belleville*

---

[15] These include conduct involving invasion of the right of privacy, *Hinish v. Meier and Frank Co.*, 166 Or 482, 113 P2d 438 (1941); wrongful attachment of property, *Crouter v. United Adjusters, Inc.*, 259 Or 348, 485 P2d 1208 (1971); and trespass, *Rhodes v. Harwood*, 273 Or 903, 544 P2d 147 (1975).

plaintiff was not entitled to an award of actual damages in addition to the equitable relief of specific performance and, therefore, set aside an award of punitive damages.

This court, since ORCP 24A was adopted, has not had the opportunity to decide whether an award of punitive damages without an award of actual damages can be supported by a decree of affirmative equitable relief and, if so, what type of equitable remedy will support a claim for punitive damages.

ORCP 24A permits the joinder of legal and equitable claims. It provides:

"A plaintiff may join in a complaint, either as independent or as alternate claims, as many claims, legal or equitable, as the plaintiff has against an opposing party."

We analyze this legal problem on this basis:

(1) Punitive damages cannot exist alone.

(2) Punitive damages cannot be awarded without proof of a harm.

(3) Harm may be presumed in cases of wrongful attachment of property, invasion of privacy and trespass, or when there is a certain type of breach of fiduciary duty by a public officer.

(4) The granting of certain types of equitable relief may or may not demonstrate some harm to a person who does not have an adequate remedy at law.

In this case plaintiff Klinicki was unable to prove actual dollar damages against Lundgren and the only equitable relief granted against Lundgren in Klinicki's favor was for an accounting and an injunction against transferring assets. The constructive trust was decreed solely in favor of Berlinair. Plaintiff's claim of actual damage against Lundgren was dismissed by the court. Klinicki's claim for punitive damages existed alone.

The fact that the court granted Klinicki equitable relief against Lundgren and ABC in the form of an accounting and an injunction under other counts in the complaint did not prove any independent harm or damage to Klinicki caused by Lundgren's conduct. A decree ordering an accounting does not

prove damage or harm. The accounting may balance in favor of the defendant or the plaintiff, or may demonstrate nothing. An injunction or restraining order not to transfer assets also does not prove that Klinicki was personally harmed or damaged by Lundgren's breach of fiduciary duty. Such a decree is designed to prevent harm, not redress harm. Because the constructive trust was imposed only upon ABC, its officers and directors, and not Lundgren personally, and only in favor of Berlinair and not Klinicki, we do not reach the question whether a decree granting a constructive trust will support an award of punitive damages. The punitive damages award stood alone, and was not inextricably tied to proof by plaintiff that he had suffered an invasion of a legally protected interest. Under the circumstances of this case, the punitive damages claim was properly stricken by the court.

The Court of Appeals is affirmed.